Lincoln Theodore **PERRY**, Plaintiff-Appellant,

v.

**COLUMBIA BROADCASTING SYSTEM, INC., et al.,** Defendants-Appellees.

No. 72–1905.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1973.

Decided March 12, 1974.

Certiorari Denied Oct. 15, 1974.
See 95 S.Ct. 150.

John D. Raikos, Indianapolis, Ind., for plaintiff-appellant.

Thomas M. Scanlon, Indianapolis, Ind., for defendants-appellees.

Before SWYGERT, Chief Judge, O'SULLIVAN, Senior Circuit Judge,* and STEVENS, Circuit Judge.

SWYGERT, Chief Judge.

Lincoln Theodore Perry appeals from the district court's grant of summary judgment for the defendants. Perry, an Illinois resident, brought suit against the Columbia Broadcasting System, Inc. (CBS), Xerox Corporation, and Twentieth Century-Fox Film Corporation,[1] all incorporated in New York and doing business in Indiana, and the Indiana Broadcasting Corporation, an Indiana corporation which owned and operated WISH–TV, a television station in Indianapolis. The district court had jurisdiction under 28 U.S.C. § 1332.

Perry is a professional movie actor and entertainer nationally known by his stage name, Stepin Fetchit. CBS developed and broadcast a series of seven telecasts entitled "Of Black America." The series was broadcast nationally by CBS, sponsored by Xerox, and shown locally on WISH–TV. "Of Black Ameri-

---

* Senior Circuit Judge CLIFFORD O'SULLI-VAN of the Sixth Circuit is sitting by designation.

1. Twentieth Century-Fox was dismissed from the case on Perry's own motion.

ca" dealt with the history, culture, and experience of Negroes in the United States. The first telecast in the series was entitled "Black History: Lost, Stolen, or Strayed" and was broadcast nationally on July 16, 1968 and rebroadcast on July 23, 1968. It is this telecast that is the subject of the litigation.

"Black History: Lost, Stolen, or Strayed" was written by CBS staff and narrated by Bill Cosby, a nationally known black entertainer. According to the district court's findings the telecast "described how badly the Negro had been portrayed in the history books, the movies, and other facets of life in the United States."

In the preface of the segment of the telecast which dealt with the treatment of Negroes in movies, Bill Cosby stated:

> In the past fifty years, 33,000 feature films have been made in the United States, and about 6,000 of them have had parts for black actors. For the most part, the black portraits have been drawn by white writers, white producers, and white directors for a white audience.
>
> Most black parts were the way white Americans wanted them to be. The black male was consistently shown as nobody, nothing. He had no qualities that could be admired by any man, or more particularly, by any woman.

Famous black actors mentioned in the movie segment included Bert Williams, Bill "Bojangles" Robinson, Willie Best, and Perry. The section dealing with Perry included film clips from movies that Perry had made interspersed with the following narrative commentary by Cosby:

> The tradition of the lazy, stupid, crap-shooting, chicken-stealing idiot was popularized by an actor named Lincoln Theodore Monroe Andrew Perry. The cat made two million dollars in five years in the middle thirties. And everyone who ever saw a movie laughed at—Stepin Fetchit.
>
> \* \* \* \* \* \*
>
> It's too bad he was as good at it as he was. The character he played was planted in a lot of people's heads and they remember it the rest of their lives as clear as an auto accident.
>
> \* \* \* \* \* \*
>
> He played in movies with other actors who were as American as Mom's raspberry jello. If they accepted the stereotype, how wrong could it be?

The thrust of Perry's complaint was that the "[d]efendants, without plaintiff's permission or consent to use either his real name or take parts out of context, intentionally violated plaintiff's right of privacy and maliciously depicted plaintiff as a tool of the white man who betrayed the members of his race and earned two million dollars portraying Negroes as inferior human beings." The district court after finding no genuine issue on any material fact concluded that there was neither a defamation of Perry nor an invasion of his privacy in the telecast. A second basis for its ruling was the conclusion that defendants had a constitutional right to comment on Perry since he was a public figure involved in issues of public interest and since there was no evidence that the telecast was made with knowledge of falsity or with reckless disregard of the truth.

I

The first question is whether there was defamation. Perry contends that Cosby's statement was false in that he was neither lazy nor stupid, that the characters he portrayed in the movies never shot craps or stole chickens, and that he never made two million dollars during the middle nineteen-thirties. The record shows that, first, Cosby did not say that Perry was lazy or stupid but that the characters he portrayed represented such a "tradition." Second, the commentary did not state that Perry shot craps or stole chickens. Third, Perry was himself responsible for the erroneous two million dollar figure. He fostered the story and allowed it to circulate publicly so that he could be given

credit for being a millionaire and also for setting an example that Negroes are millionaires. He is estopped now to point out its falsity.

■ Perry also contends that a jury could reasonably have concluded from the narrative that he had been charged with selling out his race by accepting two million dollars for portraying black people as "lazy, stupid, crap-shooting, chicken-stealing idiot[s]." Under Indiana law, which controls in this diversity action, a statement may be defamatory when it is such as would tend to hold the plaintiff up to hatred, contempt, or ridicule, or when it causes him to be shunned or avoided or tends to injure him in his profession, trade, or calling. Prosser v. Callis, 117 Ind. 105, 107–108, 19 N.E. 735, 736 (1889). Under this definition, the charge that Perry sold out the other members of his race would be a defamation.

■ The defendants deny such a meaning to the words and argue that the "blame for the roles was squarely placed by the telecast upon the whites who wrote, produced and directed them." We agree with the defendants that white directors, producers, and writers were blamed in the telecast for creating the role, but this does not exclude the construction that Perry has placed on the words in issue. We agree that a jury could have found the intended meaning of the commentary was that Perry had sold out his race for money. A different but innocent construction, however, that could reasonably have been drawn was that Perry's excellent character portrayal reinforced the stereotype view that many white persons had of blacks during the nineteen-thirties and that white moviegoers were willing to pay two million dollars for that reinforcement. "If the words [such as here in issue] are capable of two constructions, one of which would be innocent, still it [is] a matter of fact to be determined by the jury, whether they be used in an innocent sense or otherwise."

Waugh v. Waugh, 47 Ind. 580, 585 (1874).

Furthermore, in the event the jury found that a defamatory construction of the words was intended, they would then have to determine whether the intended meaning—that Perry had sold out his race—was true or false. No action would lie if that construction was true.

## II

■ The next question is whether there was an invasion of Perry's privacy. Cosby's commentary dealt with two matters, the character that Perry portrayed in the movies he made and the making of two million dollars for acting in those roles. Perry was not a private citizen; he had been extensively exposed to the public. He began performing in southern minstrel shows, moved to vaudeville, and then in 1925 appeared in the movies. He was in at least thirty-three movies in the 1920's and 1930's. His last picture prior to the alleged invasion of privacy was in 1938. However he continued from 1938 to 1968 in show business entertaining at picture clubs, fairs, radio shows, road shows, night clubs, opera houses, supper clubs, minstrel shows, vaudeville, medicine shows, Broadway shows, and on television. Perry complains that the "Black History" telecast has injured his professional reputation as an actor and caused Muhammed Ali and others to shun him. He also contends that the damage to his professional reputation caused him to lose the television role of "Sanford and Son."

Perry himself summed up his notoriety as Stepin Fetchit in a deposition:

I became a household word. I elevated the Negro and I became a Hollywood motion picture star, and this was during the time that a Negro couldn't ride in the front of a bus, couldn't go in no white restaurants, in no white hotels. This was north and south, California, and everyplace.

Thus Perry by his own admission was a public figure. Curtis Publishing Co. v.

Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L. Ed.2d 1094 (1967) (an athletic director); Cepeda v. Cowles Magazines and Broadcasting, Inc., 392 F.2d 417 (9th Cir.), cert. denied, 393 U.S. 840, 89 S.Ct. 117, 21 L.Ed.2d 110 (1968) (a professional baseball player); Time, Inc. v. Johnston, 448 F.2d 378 (4th Cir. 1971) (a professional basketball player turned coach).

A collateral question is whether the commentary, although about a public figure, concerned any element of Perry's private life which might have amounted to an invasion of privacy. Cosby's comments dealing with the stereotype created by Perry dealt with his public role as an actor, not with his private life. The comments concerning the two million dollars Perry had made in his acting career during the nineteen-thirties did not concern Perry's private life. Perry denied having made that much money and contends that it was erroneous to state otherwise. Perry however cannot complain now of the error since he is the one who initiated that misstatement.

Perry also contends that there was an invasion of his privacy when only excerpts rather than the full length of his movies were shown.[2] Perry agrees that it would not have been an invasion of his privacy to show the whole film. There was no invasion when only a portion of the film was shown. Perry, as we have earlier noted, was a public figure. The subject with which the telecast dealt, the stereotype, and erroneous characterization of Negroes in film, was a matter of public interest.[3] Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L. Ed.2d 456 (1967).

Lastly Perry contends that it was an invasion of privacy to comment on his acting role in movies during the 1930's since he had not made a movie since 1938. It is not necessary in this appeal to deal with the question whether a lapse of time will restore a public figure to the status of a private citizen.[4] Perry continued to be a public figure at the time of the broadcast. He may not have had the breadth of national fame with which he was earlier associated, but he was still active in show business and was being considered for the star role in a television series as well as for the subject of a movie about his life.

### III

The remaining question in this appeal is whether the defendants were privileged in commenting upon Perry's movie roles as Stepin Fetchit and the money that he made for his performances. The district court found that Perry was a public figure and that the issue of the treatment of Negroes in American movies was of interest to the public. As we earlier noted, we agree.

In New York Times Co. v. Sullivan, 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), the Supreme Court held that the First Amendment's protection of freedom of expression prohibited "a public official from recovering damages for a defamatory falsehood

2. Perry's contention here is confused with an argument that there has been a violation of his contract and copyright rights in showing only excerpts from his films. No action was alleged in the complaint on these theories.

3. After several years of major riots in the ghettoes of the cities, the National Advisory Commission on Civil Disorders was established to investigate the causes of the upheavals. One of the resulting recommendations was to the media to deal with the problem of race relations in this country.

In short, the news media must find ways of exploring the problems of the Negro and the ghetto more deeply and more meaningfully. To the editors who say "we have run thousands of inches on the ghetto which nobody reads" and to television executives who bemoan scores of underwatched documentaries, we say: find more ways of telling this story, for it is a story you, as journalists, must tell—honestly, realistically, and imaginatively. It is the responsibility of the news media to tell the story of race relations in America, and with notable exceptions the media have not yet turned to the task with the wisdom, sensitivity, and expertise it demands. Report of National Advisory Commission on Civil Disorders (1968), at p. 384.

4. Prosser, Torts 827–28 (4th ed. 1971).

relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." This standard was later extended to issues of public interest. Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), and to comments about public figures, Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967).

 Perry argues that the *New York Times* standard does not apply in this case since this was not a news program but a show made for profit as well as to foster militancy among blacks. The Supreme Court rejected the commercial argument in the *New York Times* case. The defamation there was a full page advertisement. "That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold." 376 U.S. at 266, 84 S.Ct. at 718. This proposition is equally applicable to motion pictures, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501–502, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), and telecasts, United Medical Laboratories v. Columbia Broadcasting System, 404 F.2d 706 (9th Cir. 1968), cert. denied, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969). Perry's second point is that the telecast encouraged "black militancy as a solution to future black problems" and that "[b]lack militancy is not an acceptable solution to either black, white, or mixed jury." Freedom of expression does not mean freedom to express only approved ideas, it means freedom to express *any* idea. "The constitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are offered.' N. A. A. C. P. v. Button, 371 U.S. 415, 445, 83 S.Ct. 328, 344, 9 L.Ed.2d 405." New York Times Co. v. Sullivan, 376 U.S. at 271, 84 S.Ct. at 721.

Perry also contends without authority that even if CBS and WISH are protected by *New York Times*, it does not apply to Xerox which sponsored the telecast. To follow this logic would leave the First Amendment a meaningless phrase in most areas of the media. It would result in advertisers in magazines, newspapers, and television being sued for statements in which they had no hand. The free and robust debate fostered by the Constitution would quickly wither at the hands of censors for advertisers. "The effect would be to shackle the First Amendment in its attempt to secure 'the widest possible dissemination of information from diverse and antagonistic sources.'" New York Times Co. v. Sullivan, 376 U.S. at 266, 84 S.Ct. at 718.

 Finally, Perry argues that there was evidence of actual malice in the production of the telecast. The trial judge made lengthy findings as to the detailed research that went into the production of this television series and found the evidence to be uncontradicted that the defendants had no knowledge of any falsity nor did they act in reckless disregard of the truth. Perry has shown us nothing to refute those findings.

The grant of summary judgment for the defendants is affirmed.