Charles WOODS, Plaintiff-Appellant,

v.

EVANSVILLE PRESS COMPANY, INC., the E.W. Scripps Company, Defendants-Appellees.

No. 85–1740.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 27, 1985.

Decided May 16, 1986.

Rehearing and Rehearing En Banc Denied June 27, 1986.

Jim Corbett, Lantz, Shaw & Corbett, P.C., Evansville, Ind., for plaintiff-appellant.

Lee Levine, Baker & Hostetler, Washington, D.C., for defendants-appellees.

Before BAUER, COFFEY, Circuit Judges, and GORDON, District Judge.*

MYRON L. GORDON, Senior District Judge.

The plaintiff, Charles Woods, brought this diversity action alleging that he was libeled by a newspaper article which appeared in *The Evansville Press* (*Press*) on June 22, 1981. The newspaper is owned and operated by defendant Evansville

Press Company, Inc. (Press Company). Defendant The E.W. Scripps Company (Scripps) is the parent corporation of the Press Company. The district court granted Scripps' motion to dismiss for lack of personal jurisdiction and also granted the motion of the Press Company for summary judgment. We affirm.

## I. FACTUAL BACKGROUND

In December 1980, Indiana Partners, Ltd., agreed to purchase television station WTVW, Channel 7, in Evansville, Indiana, for $21.5 million. Indiana Partners is a limited partnership comprised of the general partner, WTVW, Inc., of which the plaintiff owns 80%, and the limited partner, WTVY, Inc., wholly owned by the plaintiff. Mr. Woods is the president and treasurer of Indiana Partners, Ltd.

Channel 7, an American Broadcasting Company affiliate, is one of three Evansville television stations but is the only VHF station. Following the partnership's acquisition of Channel 7, Mr. Woods actively participated in the station's day-to-day operations, serving as general manager.

The sale of and subsequent changes at Channel 7 provoked a considerable amount of local media attention. Numerous articles concerning personnel and programming changes at the station, and about the plaintiff himself, appeared in the two major Evansville newspapers, the *Press* and *The Evansville Courier* (*Courier*).

From January 1980 through August 1981, Kenneth Wayne McManus, the author of the contested article, wrote a regularly published column on radio and television for the *Press*. From December 1980 through June 22, 1981, Mr. McManus devoted part or all of some 23 columns to matters concerning Channel 7, including the financing of the station purchase, advertising sales practices, station programming and ratings, and personnel changes. For example, shortly after the transfer of the station to Indiana Partners was completed, Mr. McManus published an inter-

---

* The Honorable Myron L. Gordon, Senior District Judge for the United States District Court for the Eastern District of Wisconsin, is sitting by designation.

view with Mr. Woods in which the plaintiff discussed his plans for the station, his programming philosophy, and his strong religious convictions.

On June 1, 1981, the *Courier* published an article in which Mr. Woods discussed, *inter alia,* his past business practices and his vigorous religious convictions. In the *Courier* article, Mr. Woods discussed how he built up his Alabama construction business following World War II:

"I'd get a house half-built and go to the bank and tell them I needed money to finish it. Then I'd take that money, pay off the building supply man, the loans on the car and the truck, sell the house and start it over again."

Mr. Woods further commented:

"You can only earn so much money with your own two hands, regardless of what you do. So you have to do it with other people's money. If I had $1 million in the bank, and could buy one apartment building outright, I'd buy 10, putting 10 percent down on each."

Mr. McManus read the *Courier* article prior to publishing his June 22 column in the *Press.*

In gathering information for his column, Mr. McManus periodically met with employees of several Evansville television and radio stations, including William E. FitzGerald III, the local news anchorman on Channel 7 from August 1978 to June 1981. Upon learning of Mr. FitzGerald's plans to leave Channel 7, Mr. McManus asked him if he would agree to an interview. Mr. FitzGerald had become disgruntled about changes in station policies and programming following the change in station ownership. Mr. FitzGerald eventually agreed to be interviewed on June 17, 1981.

Based upon this interview, Mr. McManus wrote the column at issue which appeared in the *Press* on June 22, 1981. The column, entitled "Departing anchorman FitzGerald predicts changes at Channel 7," consists almost in whole of statements made by Mr. FitzGerald regarding the plaintiff's ownership and operation of Channel 7 and Mr. FitzGerald's predictions of future changes

at the station. In particular, the column reported Mr. FitzGerald's "possible scenario" for an ownership change at the station:

FitzGerald says he believes Woods will not be the owner and general manager of Channel 7 within two years. "Here's a possible scenario, based on what I know, and remember I'm not an economic expert," he said. "He owes a consortium of insurance companies $22 million," he explained. "And he has to make biannual interest payments on that money. He's going to make the one due at the end of this month, but after that, I'm not so sure.

"He's almost giving away commercials. Eventually, the whole market of television sales will become depressed because local businesses will tell the other two stations, 'Well, I can get a low cost-per-thousand (homes reached) on commercial time at Channel 7. Why should I pay your price? A question of quality? Not really.'

"So if he has trouble making the interest payments at the end of the year and the middle of next year, he'll devise a list of excuses that will sound good, the consortium will give him the money to keep the station afloat by buying a bigger piece of it and eventually push him out. The insurance companies may eventually own the station as he needs more money to keep it afloat."

Mr. McManus went on to report Mr. FitzGerald's view of Mr. Woods' religious programming:

Even in programming decisions, FitzGerald is convinced Woods is involved in "misdirection—the old shell game, where they have you looking in one place while something is going on someplace else."

"The public needs to know some things about religious programs, for example," FitzGerald said. "I was always brought up that you must be Christian in word *and deed.* He keeps talking about giving Billy Graham and James Robison all the time they want on his station. It's not for religion sake. Religious organizations pay for the air time, whatever

the going price is, and they pay it up front."

Woods has gone in front of the camera to do a Channel 7 contest promotion soliciting reasons people should go to church. Entries must be submitted in 75 words or less, the winning entry will be converted to a public service announcement, the author will receive $250, and another $250 will be donated to the church of the author's choice. At that, FitzGerald shook his head and said, "I seriously question that kind of commercialization. I really don't think God really needs a contest to get his message across."

It is uncontested that prior to publication, Mr. McManus checked with Mr. Fitz-Gerald to verify that the column correctly reported Mr. FitzGerald's statements.

Mr. Woods filed the present action against the defendants on December 30, 1981. The plaintiff contends that the June 22 column defames him by falsely implying that he is a dishonest person with financial problems and by misrepresenting his religious beliefs. On April 17, 1985, the district court granted Scripps' motion to dismiss the complaint against it for lack of personal jurisdiction and also granted the Press Company's motion for summary judgment. The plaintiff appeals the district court's decision as to each motion.

## II. DISCUSSION

In the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct. 710, 725-26, 11 L.Ed.2d 686 (1964), the Supreme Court held that the Constitution "prohibits a public official from recovering damages for a defamatory falsehood relative to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Ten years later, in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347-48, 94 S.Ct. 2997, 3010-11, 41 L.Ed.2d 789 (1974), the Court held that individual states are not required by the Constitution to apply the qualified privilege

set forth in the *New York Times* case to actions brought by private individuals which concern matters of public interest. The Court concluded that it is the prerogative of the states to define the appropriate liability standard for actions involving defamation against a private person provided liability is not imposed without fault. *Id.* at 323, 94 S.Ct. at 2997.

■ Following the *Gertz* decision, the Indiana Court of Appeals adopted the holding of the plurality in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), that the *New York Times* privilege applies to libel actions brought by a private individual which concern matters of general or public interest. *Aafco Heating & Air Conditioning Co. v. Northwest Publications, Inc.*, 162 Ind.App. 671, 321 N.E.2d 580, 586 (1974), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). Thus, under Indiana law, applicable in this diversity action:

"the private individual who brings a libel action involving an event of general or public interest [must] prove that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard of whether it was false."

*Aafco, supra*, 321 N.E.2d at 586; *see also Cochran v. Indianapolis Newspapers, Inc.*, 175 Ind.App. 548, 372 N.E.2d 1211, 1218 n. 3 (1978). It follows that Mr. Woods is obliged to prove "actual malice" as that term is defined in the landmark *New York Times* case. 376 U.S. at 279-80, 84 S.Ct. at 725-26.

The district court concluded that the June 22 column concerned matters of "general or public interest," and, accordingly, applied the actual malice standard to the plaintiff's libel claim. The plaintiff does not contest the district court's determination that Mr. Woods' purchase and operation of Channel 7, the subjects of the contested column, were matters of public interest in Evansville. He contends, nevertheless, that the actual malice standard does not apply in the present case "because [he] is a competitor of the Defendants and much of what the Defendants published

concerns the Plaintiff's competitive posture." The plaintiff, in effect, characterizes the June 22 column as commercial speech published solely for profit, advancing no legitimate public interest, and thus, not protected by the first amendment of the federal Constitution.

The court need not address the plaintiff's underlying assumption that "commercial defamation," whatever he means by this term, is not protected under the first amendment. The present case is governed by state, not federal, law. The *Aafco* holding provides for no exception where the alleged defamatory publication was made by a competitor of the plaintiff. The court in *Aafco* focused not on the relationship of the parties to each other but on whether the challenged publication concerned a matter of public interest. In this case, the June 22 column addressed a subject of significant interest in the Evansville community; the plaintiff's purchase and operation of Channel 7.

■ Moreover, it is immaterial to the application of the qualified constitutional privilege that the defendants may have profited from the publication at issue. *New York Times, supra,* 376 U.S. at 266, 84 S.Ct. at 718; *see also, Perry v. Columbia Broadcasting System, Inc.,* 499 F.2d 797, 802 (7th Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). It would stifle the discussion of matters of public importance if the plaintiff could strip the defendants of their qualified privilege merely by showing that the challenged article was published, at least in part, with the hope of increased sales. *See Pittsburgh Press Co. v. Pittsburgh Comm. on Human Relations,* 413 U.S. 376, 384–85, 93 S.Ct. 2553, 2558–59, 37 L.Ed.2d 669 (1973). Thus, even if we assume that the defendants reaped a monetary profit as a result of publishing the June 22 column, and there is no evidence to support this assumption in the record, the defendants would still be entitled to the qualified privilege adopted in *Aafco.*

■ Finally, the June 22 column simply cannot be characterized as commercial speech. The term "commercial speech" has predominantly been used in the first amendment context to describe commercial advertising. *See, e.g., Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942). The June 22 column clearly is not advertising by any stretch of the imagination. Thus, because the subject of the June 22 column was of general interest to the community, the actual malice standard is applicable to this case.

Mr. Woods contends that there is sufficient evidence that the defendants acted with actual malice in publishing the June 22 column to merit a jury trial. In order to recover on a defamation claim, the plaintiff must prove actual malice with "convincing clarity." *New York Times, supra,* 376 U.S. at 285–86, 84 S.Ct. at 728–29; *see also Gertz, supra,* 418 U.S. at 342, 94 S.Ct. at 3008 (actual malice must be established by "clear and convincing proof"). This standard is greater than a "preponderance of the evidence," the normal civil standard, but less than "beyond a reasonable doubt," the criminal standard. *See Yiamouyiannis v. Consumers Union of the United States,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 246 (1980).

The plaintiff may establish actual malice by proving either that the defendant published the defamatory statement with knowledge of its falsity or with reckless disregard for whether it was false. *New York Times, supra,* 376 U.S. at 280, 84 S.Ct. at 726. Knowledge of falsity means simply that the defendant was actually aware that the contested publication was false. *See Hutchinson v. Proxmire,* 431 F.Supp. 1311, 1328 (W.D.Wis.1977), *aff'd,* 579 F.2d 1027 (7th Cir.1978), *rev'd on other grounds,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

Reckless disregard of the truth or falsity of a publication is established by showing that the defendant "in fact entertained seri-

ous doubts as to [its] truth," *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), or that the publication was made with a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964). Proof of actual malice, therefore, depends upon the defendant's actual state of mind. *Herbert v. Lando,* 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979). "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant, supra,* 390 U.S. at 731, 88 S.Ct. at 1325. Negligence, in other words, is not enough.

Probative evidence of recklessness includes a publisher's knowledge of serious factual inconsistencies, as well as his failure to investigate or independently verify disputed or questionable factual assertions. *Aafco, supra,* 321 N.E.2d at 589. Recklessness may be found, for example, where there are clear reasons to doubt the truthfulness of the informant or the accuracy of his reports or where a story is fabricated by the defendant or is based entirely on an unverified anonymous telephone call. *St. Amant, supra,* 390 U.S. at 732, 88 S.Ct. at 1326. At the same time, proof of failure to investigate, by itself, is not sufficient to establish a publisher's reckless disregard for the truth or falsity of the challenged publication. *Gertz, supra,* 418 U.S. at 332, 94 S.Ct. at 3003.

This court employs the following test when applying the "convincing clarity" standard to summary judgment motions:

> "Unless the court finds on the basis of pretrial affidavits, depositions or other documentary evidence, that the plaintiff can prove actual malice in the *[New York] Times* since, it should grant summary judgment for the defendant.

*Carson v. Allied News Co.,* 529 F.2d 206, 210 (7th Cir.1976) (quoting *Wasserman v. Time, Inc.,* 424 F.2d 920, 922–23 (D.C.Cir.) (Wright, J., concurring), *cert. denied,* 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970)); *see also Fadell v. Minneapolis*

*Star & Tribune Co., Inc.,* 557 F.2d 107, 108 (7th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977). If the court concludes, therefore, that no reasonable jury could find actual malice with convincing clarity, the defendant is entitled to judgment as a matter of law. *Accord Rebozo v. Washington Post Co.,* 637 F.2d 375, 381 (5th Cir.), *cert. denied,* 454 U.S. 964, 102 S.Ct. 505, 70 L.Ed.2d 379 (1981); *Yiamouyiannis, supra,* 619 F.2d at 940 (citation omitted); *contra Liberty Lobby, Inc. v. Anderson,* 746 F.2d 1563, 1570–71 (D.C.Cir. 1984), *cert. granted,* — U.S. —, 105 S.Ct. 2672, 86 L.Ed.2d 691 (1985) (rejecting application of the "convincing clarity" standard at the summary judgment phase of a lawsuit). In making this determination, the court must independently examine the record, construing the facts and inferences drawn therefrom in the light most favorable to the party opposing summary judgment. *See Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985); *Carson, supra,* 529 F.2d at 210.

Although the applicability of the "convincing clarity" standard at the summary judgment phase of defamation litigation is presently before the Supreme Court in *Liberty Lobby, supra,* the plaintiff does not raise this issue. Rather, he asserts that the district court misapplied the standard to the Press company's motion for summary judgment. The district court stated: "Absent proof [of actual malice] with 'convincing clarity' summary judgment must be granted to the defendants." Quoting *Fadell v. Minneapolis Star & Tribune Co.,* 425 F.Supp. 1075, 1086 (N.D.Ind.1976), *aff'd, Fadell, supra,* 557 F.2d at 107.

The district court suggested that the plaintiff must prove his case at the summary judgment stage of the litigation; however, if this were the rule, resolution of a motion for summary judgment would amount to a trial on the merits of the plaintiff's case. The court's role in reviewing a summary judgment motion "is to determine whether there are issues to be tried; it is not to try disputed issues on the

affidavits." *Brown University v. Kirsch,* 757 F.2d 124, 129 (7th Cir.1985).

We need not resolve the question whether the district court, in fact, required the plaintiff to prove actual malice with convincing clarity rather than just to establish the existence of a triable issue of fact. Even if we concluded that the district court erred, our analysis of this case would not be affected. In reviewing the district court's decision granting summary judgment, we evaluate the record de novo to determine whether the moving party is entitled to judgment as a matter of law. *See Grzelak v. Calumet Publishing Co., Inc.,* 543 F.2d 579, 582 (7th Cir.1975).

■ The plaintiff does not claim that the June 22 column on its face contains false and defamatory statements. Instead he contends that it falsely implies that he is dishonest, is in financial trouble, and is a religious fraud. The plaintiff then cites numerous statements made by Mr. McManus in his deposition to show that the columnist believed Mr. Woods to be honest, very wealthy, and deeply religious. Based on this evidence from Mr. McManus' deposition, which contradicts the defamatory implications Mr. Woods ascribes to the column, the plaintiff concludes that the defendants, through Mr. McManus, published the column with actual knowledge or reckless disregard of its falsity.

The defendants do not claim that the June 22 column is incapable of being read to contain the defamatory innuendoes the plaintiff attributes to it. Nor do they argue that Mr. McManus actually believed that the plaintiff was a liar, was financially insolvent, or was a religious fraud. The defendants, rather, contend that the plaintiff has made no showing of actual malice because the record is lacking in any evidence that Mr. McManus intended or understood the column to contain the plaintiff's inferences and, nevertheless, published it believing the implications to be false. The defendants also argue that Mr. Fitz-Gerald's remarks were consistent with what Mr. McManus knew about Mr. Woods and the financial status of Channel 7.

An implied statement, just as a statement made in direct language, can be defamatory. *Cochran, supra,* 372 N.E.2d at 1217. It is initially a question of law for the court to decide whether a statement considered in its entirety is capable of possessing a defamatory meaning or implication. *Id.,* 372 N.E.2d at 1216. Where a statement is reasonably susceptible to both defamatory and non-defamatory meanings, the matter of interpretation should be left to the jury. *Perry, supra,* 499 F.2d at 800; *Rose v. Indianapolis Newspapers, Inc.,* 213 F.2d 227, 229 (7th Cir.1954). The threshold issue of defamatory content was not raised in the court below nor is it argued on appeal. The court will assume for purposes of analysis, therefore, that the June 22 column can reasonably be read to contain the defamatory implications that the plaintiff ascribes to it.

This is not to say, however, that the plaintiff's interpretation of the column is the only reasonable one or that the column's author, Mr. McManus, shared this reading. Different, innocent constructions also reasonably could have been drawn from the column. Mr. FitzGerald's "possible scenario" for future station ownership can be read simply to imply that due to inadequate revenues the station would not be able to pay its own way and would be sold in the future by Mr. Woods. Merely because the plaintiff had great personal wealth and had several successful investments does not mean that he would use his personal assets or the income from his other investments to cover the interest payments for the purchase of Channel 7. One could well expect that a successful businessman such as Mr. Woods would not continue indefinitely to hold an investment that was not paying its way. In any case, Mr. FitzGerald's prediction is that the plaintiff may eventually sell his entire interest in the station to the consortium of insurance companies, not that he would default on his loan. The June 22 column clearly need not be read to imply that Mr. Woods himself is personally at the brink of financial disaster.

Moreover, Mr. Mr. FitzGerald's prediction that Mr. Woods would "devise a list of excuses that will sound good" to obtain money from the consortium of insurance companies to keep the station afloat does not necessarily imply that the plaintiff is a liar. In this context, a "list of excuses" can mean no more than that Mr. Woods would offer honest justifications for any failure to meet the interest payments. Mr. FitzGerald's characterization of the plaintiff as engaged in "misdirection—the old shell game" does not inexorably imply that Mr. Woods is dishonest. The characterization can also be read in the context of the entire column to mean only that the plaintiff is an adroit, street-smart businessman who would not "show his hand" to others.

Mr. FitzGerald's comment that Mr. Woods' religious programming is "not for religion sake" but is motivated by financial considerations need not be read to suggest that the plaintiff is a religious faker. The statement can be read merely to mean that the plaintiff is a businessman who makes programming decisions on the basis of potential station profit. Mr. Woods nowhere suggests that producers of religious programming did not pay for their air time. Nor is Mr. Woods able to point to any statement in the column attacking his personal religious beliefs.

■ Finally, Mr. FitzGerald's comment as to the plaintiff's motivation for airing religious programming is best characterized as a statement of opinion and not a statement of fact. Statements of opinion, no matter how pernicious, are absolutely privileged under the first amendment. *Gertz, supra,* 418 U.S. at 339–40, 94 S.Ct. at 3006–07. Mr. FitzGerald's comment is not objectively verifiable and read in context would not be understood as a statement of fact by a reasonable reader. *See Ollman v. Evans,* 750 F.2d 970, 979 (D.C. Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). Similarly, Mr. FitzGerald's comments critical of the Channel 7 contest soliciting reasons why people should go to church are non-actionable statements of opinion.

The plaintiff essentially contends that he can establish actual malice by showing, first, that a statement is capable of a defamatory meaning and, second, that the defendants knew these potential implications to be false or acted with reckless disregard to their falsity. There is a missing link, however, in the plaintiff's reasoning. Simply because a statement reasonably can be read to contain a defamatory inference does not mean, as is the case here, that this inference is the only reasonable one that can be drawn from the article. Nor does it mean that the publisher of the statement either intended the statement to contain such a defamatory implication or even knew that readers could reasonably interpret the statement to contain the defamatory implication.

■ In the present case, there is no evidence that the defendants, through Mr. McManus, shared the plaintiff's interpretation of the June 22 column or intended that the column be read to contain the defamatory innuendoes the plaintiff attributes to it. At most, the evidence shows that the column is capable of supporting false and defamatory implications with which Mr. McManus himself disagreed, according to his undisputed statements by way of deposition. This evidence is insufficient to create a triable issue that the defendants acted with actual knowledge or with reckless disregard of the falsity of the column.

■ In *New York Times, supra,* 376 U.S. at 279, 84 S.Ct. at 725, the Supreme Court recognized that a rule requiring a publisher to guarantee the truth of his statements would result in "self-censorship," which would have a chilling effect on public debate and the free exchange of ideas. *See also Aafco, supra,* 321 N.E.2d at 588. Similarly, requiring a publisher to guarantee the truth of all the inferences a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern. A publisher reporting on matters of general or public interest cannot be

charged with the intolerable burden of guessing what inferences a jury might draw from an article and ruling out all possible false and defamatory innuendoes that could be drawn from the article.

The result in this case might be different if the column could reasonably have only the meaning the plaintiff ascribes to it or if there was evidence that Mr. McManus harbored ill-will for the plaintiff. *See Cochran, supra,* 372 N.E.2d at 1222. In *Cochran,* the plaintiffs brought a libel action in which they claimed, *inter alia,* that an article published by the defendants contained the false and defamatory implication that the plaintiffs were engaged in "illegal sex activities." The court in *Cochran* expressed its frustration in applying the actual malice standard to defamatory implications:

"Logic fails when one defamed by [an implied] statement is required to show knowledge of or reckless disregard for its falsity, when in fact it can rarely be proven that the author even knew of the implication.

"As a result, the actual malice standard, as now applied, rewards a publisher or reporter for communicating a statement in a surreptitious and invidious manner by implication."

*Id.,* 372 N.E.2d at 1222. The court concluded that because in the case before it there was evidence that the reporters were motivated by ill-will against the plaintiffs and that they had previously attempted to obtain false information about the plaintiff, a jury could find that the reporters wrote the article intending to suggest the false and defamatory implication at issue. *Id.* The court in *Cochran* also found evidence to suggest that the defendants intentionally fabricated a portion of the challenged article. *Id.,* 372 N.E.2d at 1221.

In the present case, there is no evidence that in publishing the June 22 column Mr. McManus or the defendants were motivated by "ill-will" against Mr. Woods or that they had previously attempted to obtain false information about the plaintiff. There also is no evidence of any fabrica-tion, intentional or otherwise, in the column. As previously noted, the record demonstrates that the column accurately reported Mr. FitzGerald's comments. In sum, there is no evidence that the defendants acted surreptitiously or with invidious intent in publishing the column.

■ It is true that Mr. McManus knew when he published the challenged column that Mr. FitzGerald was a disgruntled employee of Channel 7 and that he was not a financial expert. These facts alone, however, are not enough to establish that the author had serious doubts about the veracity of his source. Reliance on a single source, in the absence of a high degree of awareness of probable falsity, does not constitute actual malice. *New York Times Co. v. Connor,* 365 F.2d 567, 576 (5th Cir. 1966). Mr. McManus made no attempt to conceal Mr. FitzGerald's lack of economic expertise from his readers; on the contrary, he included in the June 22 column Mr. FitzGerald's statement, "I'm not an economics expert," qualifying his prediction concerning future ownership of Channel 7.

In addition, Mr. McManus had known Mr. FitzGerald for quite some time prior to the interview which led to the June 22 column. There is no evidence in the record that he doubted or had any reason to question Mr. FitzGerald's integrity. *See Grzelak, supra,* 543 F.2d at 583. The plaintiff has not produced any evidence that Mr. FitzGerald had any personal animosity toward the plaintiff, any motivation to be dishonest in his comments, or a poor reputation for truthfulness. The court notes in this regard that Mr. FitzGerald was not fired from his position at Channel 7 but left of his own volition to take another job.

Finally, Mr. FitzGerald's comments were consistent with facts known to Mr. McManus at the time the contested column was published. First, Mr. McManus had learned from the June 1, 1981, *Courier* article that Mr. Woods' business strategy was to use leverage in his investments. Mr. McManus also knew from his discussion with members of the Evansville broad-

casting industry that the Channel 7 advertising rates had decreased substantially. Mr. FitzGerald's comment that the plaintiff is "almost giving away commercials" is non-libelous "rhetorical hyperbole" used in this case forcefully to communicate the considerable drop in the station's advertising rates. *See Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1542, 26 L.Ed.2d 6 (1970). Mr. McManus knew prior to June 22, 1981, that Channel 7 was operating in the red. These facts, uncontested by the plaintiff, are consistent with Mr. FitzGerald's prediction that Mr. Woods' ownership interest in Channel 7 would eventually be acquired by the consortium of insurance companies that had initially lent him the money to purchase the station.

Mr. McManus also knew Mr. Woods to be a shrewd, successful businessman, albeit one who was very religious. This knowledge is not inconsistent with Mr. FitzGerald's comment that the plaintiff's penchant for religious programming was motivated by financial and not religious considerations. There were, in sum, no "obvious reasons [for Mr. McManus] to doubt the veracity of [his source] or the accuracy of his reports." *St. Amant, supra,* 390 U.S. at 732, 88 S.Ct. at 1326.

Mr. McManus' journalism skills are not on trial in this case. The central issue is not whether the June 22 column measured up to the highest standards of reporting or even to a reasonable reporting standard, but whether the defendants published the column with actual malice—actually knowing it to be false or having serious doubts as to its truth. Based upon our review of the record, we conclude that the plaintiff has failed to demonstrate that a trier of fact reasonably could find that the defendants published the June 22 column with actual malice. Accordingly, we affirm the district court's grant of summary judgment.

As an alternative basis for its summary judgment holding, the district court relied on the neutral reportage privilege, first enunciated by the Court of Appeals for the Second Circuit in *Edwards v. Nat'l Audubon Soc'ty, Inc.,* 556 F.2d 113, 120 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). This court has not previously had occasion to consider whether to adopt this privilege. We need not do so in this case in light of our holding that the evidence is insufficient to create a triable issue of actual malice.

Based on our holding, it is also unnecessary for us to review the district court's dismissal of the plaintiff's claim against Scripps for lack of personal jurisdiction.

For the foregoing reasons, the judgment of the district court is affirmed.