Jeffrey M. MASSON, Plaintiff,

v.

The NEW YORKER MAGAZINE, INC. and Janet Malcolm, Defendants.

No. C–84–7548 EFL.

United States District Court, N.D. California.

Sept. 9, 1993.

1352

Charles O. Morgan, Jr., Paul Kleven, San Francisco, CA, for plaintiff.

James M. Wagstaffe, Cooper, White & Cooper, San Francisco, CA, Gary L. Bostwick, Santa Monica, CA, for defendants.

### MEMORANDUM AND ORDER

LYNCH, District Judge.

#### I. *Introduction*

The facts regarding defendant Janet Malcolm's extensive interviews of plaintiff Jeffrey Masson as a subject of a lengthy profile, defendant New Yorker's publication of the profile in a two-part series, and plaintiff's contention that the article defamed him by falsely quoting him have been fully set forth by this Court and the other courts which have considered this action. *See Masson v. New Yorker Magazine, Inc.*, 686 F.Supp. 1396 (N.D.Cal.1987); *Masson v. New Yorker Magazine, Inc.*, 895 F.2d 1535 (9th Cir.1989); *Masson v. New Yorker Magazine, Inc.*, —— U.S. ——, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896 (9th Cir.1992). These facts will be repeated here only as necessary.

Trial was set in this matter on five quotations [1] which plaintiff alleged were false and defamatory to him. After a three-week jury trial and three days of jury deliberation, the jury answered eight of nine special verdict questions. The jury found that all five quotations were false, *Special Verdict Questions 1*, and all five were defamatory, *Special Verdict Questions 2*. In considering the case against Janet Malcolm, the jury found that she was aware that the "sex, women, fun" and "wrong man" quotations defamed plaintiff, *Special Verdict Question 3*, and that Malcolm acted with knowledge of falsity or reckless disregard as to the falsity of those two quotations. *Special Verdict Question 4*. The jury also found that those two quotations damaged plaintiff, *Special Verdict Question 8*. However, the jury was unable to reach a unanimous decision on the amount of damages. *Special Verdict Question 9*. As to the New Yorker, the jury found that Malcolm was an independent contractor rather than an employee, so that her acts were not imputed to the New Yorker. *Special Verdict Question 5*. The jury also found that the New Yorker was aware of the defamatory meaning of the "sex, women, fun" quotation, *Special Verdict Question 6*. However, it found that the New Yorker did not act with knowledge that quotation was false or with reckless disregard as to the falsity of that quotation. *Special Verdict Question 7*.

The Court is now faced with a number of post-trial motions. These motions include the New Yorker's *Motion To Enforce Jury Findings And For Entry Of Judgment;* Masson's *Motion For Partial New Trial Or, In The Alternative, For New Trial;* Malcolm's *Motion For Re–Trial On All Issues As To Her;* Malcolm's *Motion For New Trial On The Grounds That The Verdict Is Against The Weight Of The Evidence;* Malcolm's *Motion For New Trial On The Grounds Of Erroneously Excluded Evidence;* Malcolm's *Motion For New Trial On The Grounds Of Inconsistent Verdicts;* Malcolm's *Motion For New Trial On The Grounds Of Erroneous Jury Instructions;* Malcolm's *Motion In The Alternative Re-*

---

1. The five quotations are set forth in full in *Masson v. New Yorker*, —— U.S. at —— - ——, 111 S.Ct. at 2425–28. They will be referred to as the "intellectual gigolo," "sex, women, fun," "I don't know why I put it in," "greatest analyst," and "wrong man" quotations.

*garding The "Wrong Man" Quote;* and Masson's *Motion To Strike Juror Declarations.* A hearing on these motions was held on August 3, 1993, with all parties represented by counsel. The Court requested additional briefing from the New Yorker and from plaintiff, and those briefs have been filed with the Court.

Although the Court is presented with nine separate motions, several issues are overlapping and dispositive, and there is no need to address each of these motions or all of the issues presented by them.

In resolving the issues before it, the Court will first conduct an independent review of the evidence against the New Yorker to the extent that such a review is necessary. The Court will next consider whether it erred in instructing the jury that Masson had to prove that both defendants were aware of the defamatory meaning of the five quotations at issue here by a preponderance of the evidence. Third, the Court will determine the merits of plaintiff's arguments regarding defendant Malcolm's employment status. Fourth, the Court must decide whether to enforce any of the jury's actions with respect to the New Yorker and whether it should enter judgment in favor of the New Yorker. Finally, the Court must determine the scope of the new trial necessitated by the jury's failure to reach a unanimous determination on the issue of damages.

## II. *Discussion*

### A. *Independent Review*

 In defamation cases involving public figure plaintiffs and media defendants, the Court is required to independently review the evidence to ensure that the judgment "does not constitute a forbidden intrusion on the field of free expression." *New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84

S.Ct. 710, 728, 11 L.Ed.2d 686 (1964); *Bose Corp. v. Consumers Union of United States Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 1965, 80 L.Ed.2d 502 (1984). In *Bose v. Consumers Union,* the Supreme Court held that "[j]udges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Id.* at 511, 104 S.Ct. at 1965. This duty appears to apply to trial courts reviewing post-trial motions. *Tavoulareas v. Piro,* 817 F.2d 762, 776–77 (D.C.Cir.1987). In considering the scope of review, the Ninth Circuit has held that a reviewing court is required to conduct a highly deferential review of credibility determinations, and a less deferential review of the factfinder's evaluation of other evidence. *Newton v. National Broadcasting Co.,* 930 F.2d 662, 672 (9th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 192, 116 L.Ed.2d 152 (1991).[2]

In the absence of a finding of liability, the policy reasons for an independent review would appear to carry less force. However, in an abundance of caution, the Court will review the evidence presented against the New Yorker[3] regarding knowledge of falsity or reckless disregard of falsity. The Court's review will be limited to four of the five quotations: "sex, women, fun," "intellectual gigolo," "greatest analyst," and "I don't know why I put it in." The parties agreed that the "wrong man" quotation was never brought to the New Yorker's attention because the challenged editing occurred before the manuscript was submitted to the magazine. The parties thus stipulated that the New Yorker was not liable for that quotation.

In conducting this review, it is necessary for the Court to first look to the Ninth Circuit's rationale in remanding the case

---

2. It would appear that this Court's credibility determinations are of importance as well, given that the Court had the "opportunity to observe the demeanor of the witnesses." *Bose,* 466 U.S. at 499–500, 104 S.Ct. at 1958–59. Moreover, the Ninth Circuit held that the appellate court must "give special deference to the jury's and district court's credibility determinations." *Newton,* 930 F.2d at 672.

3. The Court here considers only the New Yorker's independent liability. The jury found that Janet Malcolm was an independent contractor, and not an employee of the magazine. The New Yorker was thus not found to be vicariously liable for Malcolm's conduct. The Court will address the issue of vicarious liability at greater length below.

against the New Yorker to this Court. The Court will then look at the evidence presented at trial. It will next analyze the jury's answers to special interrogatory questions. Finally, the Court will independently analyze the evidence presented.

### 1. Ninth Circuit Remand

After the Supreme Court's decision in this case, *Masson v. New Yorker,* —— U.S. ——, 111 S.Ct. 2419, the Ninth Circuit ordered the case to proceed against the New Yorker on remand in *Masson v. New Yorker,* 960 F.2d 896. In reviewing the evidence presented at the summary judgment stage and construing the facts as alleged by plaintiff in the light most favorable to him, *Masson v. New Yorker,* —— U.S. at ——–——, 111 S.Ct. at 2434–35, the Ninth Circuit held that a reasonable jury could find in his favor if his version of events were proved at trial.

The court of appeal found that there were several possible scenarios which, if proved, would support a finding for plaintiff. First, the court supposed that events preceding the publication of the article may have made the New Yorker aware of falsity or may have given it obvious reasons to doubt the veracity of Malcolm's reporting. The court focused in particular on the fact-checking conversation between plaintiff and the New Yorker's fact-checker, construing the facts most favorable to plaintiff and extrapolating from his version of events. Second, the court supposed that information about the editing of the "sex, women, fun" quotation could have given the New Yorker pause about that quotation and the article as a whole. The Ninth Circuit did not refer to any evidence directly related to the "intellectual gigolo" quotation, the "I don't know why I put it in" quotation, or the "greatest analyst who ever lived" quotation.

#### a. Fact–Checking Incident

The Ninth Circuit put great weight on the fact-checking "incident". The evidence presented at the summary judgment phase showed that a fact-checker for the New Yorker named Nancy Franklin telephoned plaintiff to check various facts in the article, some of which were contained in plaintiff's quotations. Plaintiff alleged that during a short conversation, he pointed out a number of inaccuracies in several quotations.[4] He contended that this upset him and gave him concern about the accuracy of the piece, and that he expressed these feelings to Franklin. He further alleged that he asked Franklin to speak with Malcolm about the accuracy of the quotations, and asked for permission to review his quotations. Plaintiff alleges that Franklin assured him that all quotations would be verbatim and accurate, and that she brushed him off with promises to speak to Malcolm and to get back to him regarding a review of his quotations.

Additional evidence introduced at the summary judgment phase related to the fact-checking process showed that several of the inaccuracies pointed out by plaintiff were corrected on a set of galleys. For instance, a notation was made changing "she is a Pole" to "she is a Polish Jew." However, this change was not ultimately included in the published article.

The Ninth Circuit held that based on this incident, a jury could conclude that the New Yorker was aware of falsity or acted in reckless disregard of falsity. The court held that "a jury could reasonably conclude that claims of inaccuracy raised in [the] context [of a fact-checking process initiated by the New Yorker] would be taken seriously." It also suggested that the fact that some of Masson's changes were made temporarily supports "the inference that The New Yorker did not dismiss Masson's charges of inaccuracy out of hand." *Id.* at 901. The court of appeal posited:

> One possible conclusion the jury might draw, were it to credit Masson's version of the events, is that Franklin did indeed

---

4. The "inaccuracies" uncovered during the fact-checking process were that Masson described his first wife as a Polish Jew, rather than a Pole who lived in the Warsaw ghetto as a child; that Masson got his first wife interested in writing about psychoanalysis rather than interested in psychoanalysis; and that Kurt Eissler did not

answer Masson's letters, not that he returned those unopened. Masson also claimed that his grandfather was from Bukhara and not Bessarabia. In this Court's view, these are relatively minor inaccuracies and in some cases may be differences in phrasing rather than factual errors.

develop a serious doubt about the accuracy of the quotations; that she looked into the matter by talking to Malcolm and/or listening to the tapes; that she (or someone else) decided it was necessary to make some of the changes in order to remove known inaccuracies; and that the quotations were changed back as a result of a conscious decision to sacrifice accuracy to creativity.

*Id.*

### b. *Sex, Women, Fun*

The summary judgment evidence also included a typed draft of the manuscript which included the sentence: "Sun would have come pouring in, people would have come, there would have been parties and laughter and fun." Malcolm crossed out that sentence and replaced it with the handwritten sentence: "Maresfield Gardens would have been a center of scholarship, but it would also have been a place of sex, women, fun."

In reviewing this evidence, the appellate court stated,

> If the jury determines that The New Yorker's editors were aware of this alteration, it could easily infer that the editors knew Malcolm was fiddling with the quotations, but still decided to shut their ears to Masson's protestations of inaccuracy. All of this would support a conclusion that The New Yorker 'in fact entertained serious doubts' as to the accuracy of Malcolm's quotations, but chose not to investigate the matter.

*Id.* at 901. The court concluded that a jury could believe that Masson's protestations of inaccuracy, plus the New Yorker's awareness that Malcolm was "fiddling with the quotations" supported a finding that "The New Yorker had developed 'obvious reasons to doubt' the accuracy of the quotations, but in an effort to 'purposeful[ly] avoid[ ] . . . the truth,' failed to conduct a reasonable investigation of Masson's claims of inaccuracy." *Masson v. New Yorker,* 960 F.2d at 901. The Ninth Circuit additionally held that,

> If the New Yorker believed the conversations in question were not on tape, it could

have confronted Malcolm with its doubts and asked her to verify the accuracy of those quotations by producing her notes and other supported materials.

*Masson v. New Yorker,* 960 F.2d at 902. In the Ninth Circuit's view, "[h]ad The New Yorker produced evidence that it took these steps and then concluded (even unreasonably) that the quotations were accurate, it would have been entitled to summary judgment." *Id.*

Based on this evidence, and the possible scenarios it envisioned, the Ninth Circuit held that the jury should be presented with the case against the New Yorker.

### 2. *Evidence At Trial*

At trial, considerably more evidence was presented regarding the New Yorker's editing and publication of the article. In addition to the testimony of plaintiff and Franklin regarding the fact-checking incident, the jury and the Court were presented with the manuscript and galleys, the testimony relating to the editing of the piece by Gardner Botsford, the editor of the article (and Janet Malcolm's husband) and William Shawn,[5] editor-in-chief of the New Yorker, expert testimony regarding journalistic practices, and evidence regarding plaintiff's contact with the New Yorker after he received the first part of the article and galleys of the second part.

### a. *Fact–Checking Incident*

Plaintiff testified to his version of the fact-checking incident. He testified that Nancy Franklin contacted him and that during the course of a short conversation, he told her that a number of the facts she was checking were incorrect. He asked if he could review the quotations, but she told him he could not. He also asked to be able to speak to Malcolm, and requested that Franklin call him back. According to plaintiff, he was angry and the conversation was emotionally charged. Denise Cammell, plaintiff's then-girlfriend, testified that she was with plaintiff at the time of the telephone call and over-

---

**5.** Mr. Shawn, now deceased, was deposed in 1986. His deposition was read at trial.

heard his portion of the conversation. She testified that he seemed upset by it.

Franklin's description of the telephone conversation differed greatly from plaintiff's. She described the telephone conversation as uneventful and somewhat lengthy. She testified that she checked a number of facts with him, and made some corrections on the galleys. However, she did not recall making a promise of further action. She also did not recall the conversation as emotionally charged or angry.

Additional evidence was presented. Telephone records indicating that the conversation lasted for forty-five minutes were introduced. The fact-checking galleys were produced. These showed that certain facts were marked as checked, others were marked as being "on author" or on the author's authority, and others were corrected or modified. The jury was also given evidence regarding fact-checking policies. The New Yorker introduced its fact-checker's "bible", in which fact-checkers were instructed to check facts within quotations, but not quotations themselves. Frederick Taylor of the Wall Street Journal, testified as an expert witness that journalists generally do not check the accuracy of quotations with people who are being quoted.[6]

The jury also heard Botsford's testimony that he reviewed the Franklin's fact-checking galley and that he decided not to make the changes plaintiff sought for a number of reasons. For instance, in discussing his decision not to change "she is a Pole" to "she is a Polish Jew", Botsford testified first that he thought the change came late in the process, and second that, "it seemed redundant. She is Polish, she is in the Warsaw ghetto. It tells you all you need to know.... She was Polish, apparently there is no debate about that, and she certainly was Jewish if she was in the Warsaw ghetto." Botsford also testified that he discussed some of the proposed changes with Malcolm, but that he does not recall the substance of the discussions.

No evidence was presented that either Franklin or Botsford formed a belief, based on the inaccuracies pointed out by plaintiff, that Malcolm was falsifying quotations. There was likewise no evidence that anyone "spot-checked" the tapes following the fact-checking conversation.

### b. Sex, Women, Fun Quotation

Evidence regarding the New Yorker's awareness of the "sex, women, fun" quotation was also presented at trial. The evidence showed that Mr. Greenstein, the libel lawyer who reviewed the article, suggested deleting the phrase "sex, women, fun" because it was potentially libelous. Botsford testified that when he saw Greenstein's notation, he advised Greenstein that the phrase was on tape, and therefore accurate. Thereafter, Botsford asked Malcolm to confirm the words were on tape. She informed him that they were not, but that they appeared in her notes. He looked at her notes, and saw those words. When questioned about his review, Botsford testified, "in my view what is on tape and what is in the notes are the same. Many reporters don't use tape. I never used tapes. But reporter's notes are as valid as tape." Botsford also testified that he saw the phrase "intellectual gigolo" when he reviewed Malcolm's notes, but that he was not concerned that the phrase was likewise not on tape.

The jury was also presented with evidence that even if the New Yorker editors were aware of any "fiddling" with the quotations, it did not concern them in the way the Ninth Circuit supposed it might. Shawn was asked, "Is it the policy of *The New Yorker Magazine* to take a partial quote from the same person in another context and put them together to create the image that it is all one quote?" Shawn Depo. at 45:22–25. Shawn replied,

> It is not a policy to do that, but it is a practice that has to be followed in many, many instances, and if it is done, again, to make something coherent or to—or for literary reasons and not to in any way

---

6. The explanation for this was that many speakers often do not believe that they said the words attributed to them, or if they believe they said those words, they often wish to modify or improve what they have said. They may regret what they have said, or may simply wish to say it more artfully.

violate the truth of the situation or of what the person is saying or distorting anything or deceive anybody, it is a practice that has been followed in many instances. I would say that it is an acceptable literary practice.

Shawn Depo. at 46:1–9.

Additionally, expert witness Nicholas Pileggi testified that this process of putting together different parts of conversations, known as "compression", was an accepted journalistic device.

### c. *Additional Evidence*

The jury was presented with other evidence which was not before the Ninth Circuit. Plaintiff presented evidence that upon reading the piece, he immediately contacted his attorney, James Brosnahan. Brosnahan testified at trial that he called the New Yorker to complain about the article on his client's behalf. He testified that he informed the New Yorker's legal counsel that the author had "trivialized" a major issue regarding Freud, and that he thought the second part of the article could be changed in a way that would satisfy his client. He additionally referred to "personal nature" of the article. He did not at that time mention misquotations or false quotations, nor did he specifically mention the five quotations before the jury.

The only evidence regarding the "intellectual gigolo" quotation was that Botsford was aware that the phrase appeared in Malcolm's notes. Plaintiff presented no evidence regarding the New Yorker's state of mind with respect to the falsity of the "I don't know why I put it in" quotation and the "greatest analyst" quotation.

### 3. *Jury's Findings*

Presented with this evidence, the jury found that the New Yorker did not act with knowledge of falsity or with reckless disregard of falsity with respect to the "sex, women, fun" quotation. Because the jury found that the New Yorker was not aware of the defamatory meaning of the "intellectual gigolo" quotation, the "I don't know why I put it in" quotation and the "greatest analyst" quo-

tation, it did not reach the question of whether the New Yorker acted with knowledge of falsity or with reckless disregard of falsity as to these quotations.[7]

The jury did not find liability for the quotation which presented the strongest case for the plaintiff; it is apparent that it did not believe that the New Yorker entertained doubts about the article as a whole. While the Ninth Circuit placed great weight on the fact-checking incident, the jury either did not credit plaintiff's account, or did not believe that the evidence supported a finding that the inaccuracies uncovered during the fact-checking conversation gave the New Yorker reasons to doubt the truth of Malcolm's reporting.

While at the summary judgment phase, disputed facts were construed in the light most favorable to the plaintiff, at trial the jury was permitted to make a credibility determination in deciding which version of the events to believe. The jury may well have determined that Franklin's version of the fact-checking event more credible, and that the conversation as Franklin described it did not give rise to "obvious reasons to doubt" the truth of Malcolm's quotations. There was no evidence that Franklin had "developed a serious doubt" about the accuracy of the quotations, nor was there evidence that Franklin either approached Malcolm or listened to the tapes herself, as the Ninth Circuit supposed she might have.

Additionally, regardless of its credibility determination, the jury may also have concluded that the corrections suggested by plaintiff did not relate to mistakes of the degree or kind that would cast doubt upon the entirety of Malcolm's reporting. The jury may have determined that the change from an interest in psychoanalysis to an interested in writing about psychoanalysis or the change from "she is a Pole" who grew up in the Warsaw ghetto to "she is a Polish Jew" were minor alterations in phrasing rather than major errors symptomatic of falsity plaguing the entire article.

In addition to supposing that the fact-checking incident may have given the New

7. The awareness requirement will be discussed in detail below.

Yorker reason to doubt the article as a whole, the Ninth Circuit also suggested that the New Yorker may have had evidence that Malcolm was "fiddling" with quotations, and that this may have alerted it to problems both with the "sex, women, fun" quotation and with the article as a whole. The Ninth Circuit additionally held that if the New Yorker believed that conversations were not on tape, it could have asked her to produce her notes as verification. The court stated, "[h]ad The New Yorker produced evidence that it took these steps and then concluded (even unreasonably) that the quotations were accurate, it would have been entitled to summary judgment." *Masson v. New Yorker*, 960 F.2d at 901. Having been presented with evidence that the New Yorker knew that the "sex, women, fun" quotation was not on tape, conducted a limited investigation into the accuracy of one quotation, and concluded that the quotation was accurate, the jury apparently credited the testimony in finding that the New Yorker did not act with knowledge of falsity or reckless disregard of falsity.

In sum, it appears from the jury's finding of no liability on this quotation that in its view, neither the knowledge that Malcolm was editing quotations nor the knowledge that that quotation was not on tape gave the New Yorker knowledge of falsity or reckless disregard of truth or falsity. It likewise appears that in the jury's view, nothing that occurred prior to publication, including the fact-checking incident or Brosnahan's call to the New Yorker, constituted proof by clear and convincing evidence that the New Yorker knew that quotations were false or acted with reckless disregard as to the falsity of quotations.

### 4. *Independent Review*

■ Upon its independent review of the evidence, the Court finds that the New Yorker neither knew that the quotations were false, nor acted with reckless disregard as to falsity. The Court saw no evidence at trial that would support the scenarios envisioned by the Ninth Circuit following the fact-checking incident. There was no evidence that Franklin developed doubts about the accura-cy of the article as a whole, nor was there evidence that the New Yorker suspected falsity and yet deliberately shut its eyes to the possibility. To the extent that the Court is bound by the jury's credibility determinations, *Newton v. National Broadcasting Co.*, 930 F.2d at 672, the Court believes that the jury must have found Franklin a more credible witness than plaintiff. And to the extent that its own credibility determinations are relevant, *id.*, the Court finds that Franklin was an extremely credible witness. Franklin's version is supported by the evidence. For example, the telephone records indicate that the conversation took nearly forty-five minutes, which was much closer to Franklin's estimate of time. Her version of events comports with the policies set forth in the fact-checker's bible, in that she checked facts contained within quotations and not quotations themselves. The galleys illustrate that Franklin made a number of factual corrections, not all of which were to plaintiff's quotations. Thus, although the fact-checking conversation as described by plaintiff may have given rise to doubts about Malcolm's reporting, the Court finds the conversation as more believably described by Franklin did not give the New Yorker obvious reasons to doubt Malcolm.

■ The Court also finds that the New Yorker's knowledge that Malcolm edited her quotations, as well as its knowledge that the "sex, women, fun" quotation and the "intellectual gigolo" quotation were in Malcolm's notes rather than on tape, did not give rise to knowledge of falsity or reckless disregard of truth or falsity with respect to those quotations. The New Yorker presented evidence that notes were considered as trustworthy as tapes. It also presented evidence that editing quotations was an accepted practice at the New Yorker. Finally, the Court finds that there was no evidence with respect to the remaining quotations. Accordingly, in its independent review of the evidence, the Court concludes that plaintiff did not meet his burden of showing by clear and convincing evidence that the New Yorker acted with knowledge of falsity or reckless disregard as to truth or falsity. The Court will therefore enforce the jury's answer to *Special Verdict Question 7*.

B. *Awareness of Defamatory Meaning*

The Court will now address plaintiff's arguments regarding awareness of defamatory meaning. In his Motion for Partial New Trial, or in the Alternative, for New Trial, plaintiff argues that the Court erred in requiring him to show that the defendants were aware of the defamatory meaning of the challenged quotations. In the reply to his motion, plaintiff argues alternatively that the Court erred in failing to include an instruction regarding reckless disregard of defamatory meaning. Both Malcolm and the New Yorker argue that the awareness of defamatory meaning was properly made an element of this case, but that plaintiff should have been required to prove awareness by clear and convincing evidence. The New Yorker additionally argues that there was no evidence of reckless disregard of awareness of defamatory meaning on the part of the New Yorker, and that plaintiff waived his objection to the Court's failure to instruct on reckless disregard.

1. *Correctness of Awareness Instruction*

The question of awareness of defamatory meaning was briefed, argued, and considered before and during the trial, and little has been added by the post-trial briefs. However, the Court will readdress the issue. Based on the same authorities the Court considered before, the Court reaffirms its finding that awareness of defamatory meaning is properly an element of this case.

a. *Pre–Trial Determination*

When the Court first indicated that it planned to instruct the jury on awareness of defamatory meaning as an element of plaintiff's defamation claims in its May 6, 1993 *Partial Tentative Ruling,* it relied on a number of grounds. The Court noted that no California case made the defendant's awareness of defamatory meaning an element of the case. However, it looked to BAJI 7.04, which was formulated by a well-regarded committee of California lawyers and judges. That model instruction states that a plaintiff must show that a defendant "knew that the statement was false and defamed plaintiff." The Court recognized that BAJI was not binding authority, but accepted it as highly persuasive. The Court also noted that the Ninth Circuit adopted a requirement of awareness of defamatory meaning in *Newton v. National Broadcasting Co.,* 930 F.2d at 680. The Court additionally looked to the Seventh Circuit. That court has likewise held that a plaintiff must establish the defendant's awareness of defamatory meaning when the statements at issue are not defamatory on their face.[8] *Woods v. Evansville Press Co.,* 791 F.2d 480, 486–87 (7th Cir. 1986); *Saenz v. Playboy Enterprises, Inc.,* 841 F.2d 1309 (7th Cir.1988). The Court also relied on a law review article which persuasively argued that such an element is required. M. Franklin and D. Bussel, *The Plaintiff's Burden in Defamation: Awareness and Falsity,* 25 Wm. & Mary L.Rev. 825 (1984).

In its May 6, 1993 *Partial Tentative Ruling,* the Court indicated that the element had to be proven by clear and convincing evidence. On May 20, 1993, the Court issued another *Tentative Ruling.* There, the Court ruled that based on California law, the appropriate standard of proof was proof by a preponderance of the evidence.

Based on its determination, the Court instructed the jury as follows:

> The third element that Mr. Masson must prove by a preponderance of the evidence, is that the defendant was aware at the time of publication of the false, defamatory meaning reasonably communicated by one or more of the challenged quotations.

*Jury Instructions* at p. 22.

b. *Reconsideration*

[redacted] The Court will now review its determination that awareness of defamatory meaning is an element of a libel case. The first question is whether the element of awareness is required by California law. Although the Court initially determined that

8. Plaintiff argues that the Supreme Court found the five quotations at issue defamatory on their face. However, the Supreme Court simply held that the five quotations were capable of defamatory meanings, and that a jury could find that plaintiff was defamed by these quotations. The issue of defamatory meaning was placed before the jury.

state law compelled such an element, the Court now decides for reasons set forth below that awareness of defamatory meaning is an element of constitutional law rather than of state law. Thus, California law is not relevant to the Court's consideration.

Plaintiff argues that awareness is not a part of the constitutional jurisprudence of defamation. He contends that this requirement has not been imposed in any constitutional case. In oral argument, plaintiff cited to Justice White's concurrence in *Greenbelt Cooperative Pub. Asso. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) to argue that there was no awareness requirement. In that case, plaintiff sued a newspaper which had used the word "blackmail" in connection with plaintiff's efforts to obtain zoning variances when the newspaper knew the plaintiff had not committed the crime of blackmail. The Supreme Court reversed the trial court, which had defined malice to a jury as "spite, hostility or deliberate intention to harm." In conducting its independent review of the evidence, the Supreme Court held that the word "blackmail" was not libelous in the circumstances of the case. The Supreme Court noted, "[I]t is simply impossible to believe that a reader who reached the word "blackmail" ... would not have understood exactly what was meant.... No reader could have thought that [defendants] were charging [plaintiff] with the commission of a criminal offense." *Id.* at 14, 90 S.Ct. at 1542. The Supreme Court held that "[t]o permit the infliction of financial liability upon [defendants] would subvert the most fundamental meaning of a free press."

Justice White concurred in the result, but argued that the *New York Times* protection should not "be extended to preclude liability for injury to reputation caused by employing words of double meaning, one of which is libelous, whenever the publisher claims in good faith to have intended the innocent meaning." *Id.* at 22, 90 S.Ct. at 1546. Justice White stated, "I see no reason why the members of a skilled calling should not be held to the standard of their craft and assume the risk of being misunderstood—if they are—by the ordinary reader of their publications." *Id.* at 23, 90 S.Ct. at 1546.

However, Justice White's concurrence, which would impose a standard by which media defendants would be liable regardless of their intent, is not the law, and no other member of the Supreme Court joined in that opinion.

Moreover, this Court finds such a requirement in the Ninth Circuit's holding in *Newton v. National Broadcasting Co.*, 930 F.2d 662 (9th Cir.1990) as well as in the holdings of the Seventh Circuit in *Woods v. Evansville Press Co.*, 791 F.2d 480 (7th Cir.1986) and *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309 (7th Cir.1988).

The Ninth Circuit's holding in *Newton* requires some discussion. In that case, entertainer Wayne Newton sued the National Broadcasting Co. ["NBC"] and several broadcast journalists after they aired a report about Newton's relationship with the Mafia and his purchase of a casino. A Las Vegas jury found that the report defamed Newton and awarded him compensatory and punitive damages. The trial court upheld the jury's liability finding and punitive damages award, but reduced the actual damages award. The trial court held that the story created the impression that plaintiff, faced with financial problems, called a Mafia friend who helped him fund his purchase of a casino in exchange for a hidden interest in the venture. The trial court held that even if the defendants "unintentionally left the impression" that Newton's purchase was funded in part by organized crime, they "should have foreseen" that meaning would be communicated to others. *Id.* at 680. The district court also found that the defamatory implication of the broadcast was "clear and inescapable." *Id.*

The Ninth Circuit reversed that finding, holding,

The district court erred in its ruling that an interpretation of the broadcast that 'should have been foreseen' by the NBC journalists can give rise to liability. The district court's standard of what 'should have been foreseen' is an objective negligence test while the actual malice test of *New York Times* is deliberately subjective.... Negligence, weighed against an objective standard like the one used by the

district court, can never give rise to liability in a public figure defamation case." *Id.* at 680. The Ninth Circuit also held that the district court erred in concluding that the defendants were aware of and intended the defamatory meaning which was "clear and inescapable" to the trial court. The Court of Appeals held "[s]uch an approach eviscerates the First Amendment protection established by the *New York Times.* It would permit liability to be imposed not only for what was not said but also for what was not intended to be said." *Id.* at 681. The Ninth Circuit has therefore held that subjective awareness of defamatory meaning must be established in order to impose liability under the First Amendment.

The Seventh Circuit reached the same conclusion in *Woods v. Evansville Press,* 791 F.2d 480, and *Saenz v. Playboy,* 841 F.2d 1309. In *Woods,* a television station owner alleged that he was libeled in a newspaper column which he alleged falsely implied that he was dishonest, in financial trouble, and a religious fraud. *Id.* at 486. The court held plaintiff had not shown that the defendant had "intended the statement to contain such a defamatory implication or even knew that readers could reasonably interpret the statement to contain the defamatory implication." *Id.* at 487. In *Saenz,* a public official sued the author and publisher of an article which he alleged implied he was involved in human rights violations. The court held "where a plaintiff is claiming defamation by innuendo, he must also show with clear and convincing evidence that the defendants intended or knew of the implications the plaintiff is attempting to draw." *Id.* at 1318.

■ Plaintiff argues that even if the awareness of defamatory meaning is an element of defamation cases, it is limited to those cases which involve innuendo or indirect defamation. However, while *Saenz* refers only to defamation by innuendo, nothing *Newton* suggests such a limitation. The purpose of the awareness element is to ensure that liability is not imposed upon a defendant who acted without fault. *Newton,* 930 F.2d at 681. This must hold true regardless of whether the defendant's statement is directly or indirectly libelous. Finally, even if the

awareness requirement is so limited, the Court finds that the quotations in this case constitute indirect libel.

■ Accordingly, for the foregoing reasons, the Court believes that awareness of defamatory meaning is properly an element of a defamation claim, particularly so in the case at hand in which the defamation is somewhat ambiguous and indirect. However, upon retrial, the Court will address the question of a reformulation of the jury instruction, given its view that awareness is a requirement of the Constitution rather than of state law and is an element of actual malice. The Court will also reconsider the issue of the appropriate standard of proof.

### 2. *Reckless Disregard Instruction*

Plaintiff's next argument is that if awareness of defamatory meaning is an element of the case, the Court should have instructed the jury that plaintiff could establish this element by showing the defendants acted in reckless disregard of defamatory meaning. The New Yorker contends that plaintiff has waived his arguments regarding an instruction on reckless disregard of defamatory meaning, and that no evidence of recklessness was presented.

#### a. *Waiver*

■ Federal Rule of Civil Procedure 51 requires parties to object to the giving or the failure to give an instruction, "stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. The Ninth Circuit has held that Rule 51 must be read in conjunction with Rule 46. *Brown v. Avemco Invest. Corp.,* 603 F.2d 1367, 1370 (9th Cir.1979). Rule 46 provides that a party need not make a formal exception so long as the party "at the time the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or the party's objection to the action of the court and the grounds therefore." Fed.R.Civ.P. 46. A party need not object only "if the party's position has previously been made clear to the court and it is plain that a further objection would be unavailing." *Brown v. Avemco,* 603 F.2d at 1370, citing 9 C. Wright & A. Miller, *Federal*

*Practice and Procedure* § 2553 at 639–40 (1971). It is not enough for a party simply to propose an alternate instruction. *Robert's Waikiki U–Drive Inc. v. Budget Rent-a-Car Systems, Inc.*, 732 F.2d 1403 (9th Cir.1984). Instead, the trial court must be "made aware of any specific concern with the proposed instructions." *Benigni v. Hemet*, 879 F.2d 473, 475–76 (9th Cir.1988). The Ninth Circuit has held that "[t]he objection must be sufficiently specific to bring into focus the precise nature of the alleged error." *Investment Service Co. v. Allied Equities Corp.*, 519 F.2d 508, 511 (9th Cir.1975). A "specific objection or argument" must focus the issue "or give the court an opportunity to modify the instruction to incorporate the elements of the ... proposed instructions." *Benigni v. Hemet*, 879 F.2d at 476.

In this case, the plaintiff and both defendants submitted both joint and separate proposed jury instructions, along with written arguments, prior to trial. The parties initially proposed Joint Jury Instruction No. 2, which included a requirement that plaintiff show that the defendants were aware of the defamatory meaning of the quotations by clear and convincing evidence. Plaintiff objected to that portion of the instruction, arguing in his *Written Arguments Regarding the Parties' Proposed Jury Instructions* that awareness of defamatory meaning was not an element of the case. However, plaintiff did not suggest at that time that recklessness should be included. Plaintiff then submitted his amended proposed jury instructions, which likewise did not address reckless disregard of defamatory meaning. On May 6, 1993, the Court issued its *Partial Tentative Ruling*, in which the Court indicated it would include an instruction requiring awareness of defamatory meaning by clear and convincing evidence. On May 10, 1993, in his response to the Court's tentative ruling, plaintiff argued that no such element was required, but alternately argued that if the Court were to include such an element, the instruction should include the possibility of reckless disregard of defamatory meaning. On May 20, 1993, the Court issued another *Tentative Ruling* in which it stated that it would instruct the jury on awareness, but that the standard of proof was preponderance of the

evidence. On May 26, 1993, plaintiff filed his proposed *Special Verdict Form*. Plaintiff's proposed form included a question about awareness of defamatory meaning, but did not propose a question relating to reckless disregard of defamatory meaning. The Court made its final ruling on the jury instructions, and the parties made their objections on the record on May 27, 1993. At that time, plaintiff stated an objection to the instructions relating to awareness of defamatory meaning. However, he did not make any mention of a standard of reckless disregard, nor did he focus his remarks or his argument on the reckless disregard standard.

 This sequence of events, taken together, indicates that plaintiff waived his objection to the failure to give the reckless disregard instruction with respect to awareness of defamatory meaning. This element was not the focus of argument or discussion, and plaintiff did not vigorously press for this instruction. Indeed, plaintiff did not even make an argument about this standard in the post-trial phase until his reply brief.

Plaintiff argues that by submitting his written argument, he had done all that he could. He states "it is unclear what further steps defendant believes plaintiff should have taken." However, plaintiff could have more vigorously pressed the issue of reckless disregard when it was clear that the Court intended to give the instruction. The Court does not believe that "it was plain that a further objection would be unavailing," *Brown v. Avemco*, 603 F.2d at 1370. Plaintiff also argues that his special verdict form did not contain the recklessness standard because "disregarding the Court's ruling on the proper instruction would have provided no benefit to anyone, and would have simply insured that plaintiff's proposed questions would not be adopted by the Court." But this argument is belied by the fact that plaintiff did "disregard" the Court's rulings on the jury instructions and continued to advocate for alternate formulations in his proposed special verdict form. For example, question 5 of plaintiff's proposed special verdict form asked the jury to determine whether Malcolm was "acting as an employee or agent of the New Yorker" at a time when the Court

had already determined that agency was not a basis for liability.

Thus, while it is a close call, the Court finds that plaintiff waived his argument on this issue.

### b. Reckless Disregard

Because the waiver question is a close one, the Court will assume for the sake of discussion that plaintiff did not waive his argument on this element, and will consider the contention that the jury should have been instructed that liability could be established by a showing of reckless disregard of defamatory meaning. While plaintiff now argues that the jury should have been so instructed, the New Yorker argues that there is no reason to have such a requirement, and that the Constitution requires actual awareness.

Before addressing whether awareness of defamatory meaning can be established by reckless disregard, it is necessary to set forth the relevant meaning of reckless disregard. Generally, the word "reckless" describes conduct which is

at essence, negligent, but which is so far from a proper state of mind that it is treated in many respects as if it were so intended.... The usual meaning assigned to "reckless" ... is that the actor has intentionally done an act of an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow, and which thus is usually accompanied by a conscious indifference to the consequences. Since, however, it is almost never admitted, and can be proved only by the conduct and the circumstances, an objective standard must of necessity in practice be applied (footnotes omitted).

W. Prosser and W. Keeton, *Handbook of the Law of Torts*, § 34 at 213 (5th Ed.1984).

■■■ However, recklessness does not denote the same objective standard in the constitutional context. Rather, the libel defendant's conduct must be viewed subjectively. *Newton v. National Broadcasting Co.*, 930 F.2d at 668–69.

As the Supreme Court stated,
A "reckless disregard" for the truth, ... requires more than a departure from rea-

sonably prudent conduct. There must be sufficient evidence to permit the conclusion that the defendant *in fact entertained serious doubts as to the truth of his publication.* The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant *actually had a high degree of awareness of probable falsity.* As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard.

*Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 2696, 105 L.Ed.2d 562 (1989), as quoted in *Masson v. New Yorker,* 960 F.2d at 899.

Likewise, in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court clearly set forth the appropriate standard for a finding of reckless disregard in the Constitutional context. The Court held,

[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publication with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.

*Id.* at 731, 88 S.Ct. at 1325.

■■■ Thus, in the constitutional context, the question becomes whether it makes sense to speak of reckless disregard of defamatory meaning. Awareness of defamatory meaning requires the defendant to have the subjective perception that a statement communicates or could communicate a meaning that injures plaintiff's reputation or otherwise defames him. *Newton,* 930 F.2d at 680. It would not be sufficient merely to say that a defendant should have perceived a defamatory meaning, or that a reasonably prudent person would have done so. *See Harte–Hanks v. Connaughton,* 491 U.S. at 688, 109 S.Ct. at 2696; *St. Amant v. Thompson,* 390 U.S. at 731, 88 S.Ct. at 1325. Constitutionally, in order to ensure that no blameless person be held liable, plaintiff

must show that the defendant was actually and subjectively aware of the defamatory meaning or potentially defamatory meaning. *See Newton*, 930 F.2d at 680.

In some ways, it is difficult to understand what reckless disregard of an awareness of defamatory meaning would mean in this context. The defendant will either have the perception that a statement is defamatory or could be defamatory, or will not have that perception. However, the Court can imagine a situation in which it would be meaningful to speak of reckless disregard of awareness of defamatory meaning. By analogy to the reckless disregard standard in the falsity arena, it may be that a defendant may subjectively be aware that certain words could possibly communicate a defamatory meaning, and yet choose to ignore that possibility. Just as a defendant may have a subjective awareness of probable falsity, a defendant may have a subjective awareness of probable defamatory meaning. And just as a defendant may act in reckless disregard of his or her perception of probable falsity, a defendant may act in reckless disregard of defamatory meaning by failing to explore whether such a meaning is communicated. It would not be enough to show that a reasonably prudent person would have understood that defamatory meaning.

■ When plaintiff argues for a reckless disregard standard, he is really arguing about the credibility of a defendant who says that he or she did not perceive a defamatory meaning. Plaintiff is actually seeking a standard by which a defendant could be held liable if he or she should have known of a defamatory meaning. Given such a standard, a plaintiff could argue that no reasonable person would have failed to perceive the defamatory meaning, and that a defendant is lying when he or she claims not to have subjectively perceived the defamatory meaning. However, the Supreme Court has held since *New York Times v. Sullivan* that the test is the defendant's subjective state of mind. Thus, while plaintiff may argue that a reasonable person would have perceived the defamatory meaning, the reasonable person standard may not be a basis for liability. *See Harte–Hanks v. Connaughton*, 491 U.S. at

688, 109 S.Ct. at 2696; *St. Amant v. Thompson*, 390 U.S. at 731, 88 S.Ct. at 1325.

■ Plaintiff also argues that when a defendant denies that he or she was aware of a defamatory meaning, defamatory meaning can never be proven. This argument, apparently based on the statements in *Bose v. Consumers Union*, 466 U.S. at 512, 104 S.Ct. at 1965, and *Newton v. National Broadcasting Co.*, 930 F.2d at 671, is a red herring. In *Bose*, the Supreme Court stated, "[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Bose*, 466 U.S. at 512, 104 S.Ct. at 1965. In *Newton*, the court stated, "[a] determination of actual malice cannot be predicated on the factfinder's negative assessment of the speaker's credibility at trial. Although discredited testimony 'does not rebut any inference of actual malice that the record otherwise supports, ... it is equally clear that it does not constitute clear and convincing evidence of actual malice.'" *Newton*, 930 F.2d at 671, citing *Bose*, 466 U.S. at 512, 104 S.Ct. at 1965. However, this is merely a statement about the amount of proof that is required. Plaintiff must prove awareness of defamatory meaning in the same way that he must prove awareness of falsity—that is, by direct and circumstantial evidence that meets the standard of proof.

In sum, then, the Court concludes that the better course may have been to instruct the jury that plaintiff could establish the element of awareness of defamatory meaning by showing the defendants acted in reckless disregard of defamatory meaning. However, plaintiff waived this argument and cannot urge it here. Nonetheless, assuming solely for the sake of argument that plaintiff did not waive this contention, the Court will next consider the evidence presented against the New Yorker to determine if any harm resulted from the failure to instruct on reckless disregard.

3. *Evidence of the New Yorker's Reckless Disregard of Defamatory Meaning*

The New Yorker contends that even if the jury should have been instructed that reck-

less disregard of defamatory meaning was sufficient to impose liability, any error was harmless. The New Yorker argues that no evidence was presented supporting a finding of recklessness. Plaintiff asserts that all of the evidence regarding reckless disregard of falsity bears on the issue of reckless disregard of defamatory meaning.

 The first question is the relevance of evidence regarding falsity. Falsity and defamatory meaning are analytically separate. A statement may be false, and a publisher may act with reckless disregard as to truth or falsity. However, if the statement is not defamatory, no liability may attach. Not all false statements are defamatory, and not all defamatory statements are false. Thus, evidence of falsity is not necessarily evidence of awareness of defamatory meaning.[9] However, if a defendant knows a statement is false, or acts in reckless disregard of falsity, and the defendant perceives a defamatory meaning or the possibility that a defamatory meaning could be communicated, liability should follow. But if the statement is capable of a defamatory meaning of which the defendant is unaware, liability should not attach. *Newton*, 930 F.2d at 680.

 In reviewing the evidence, the Court finds that plaintiff presented no evidence to establish that the New Yorker, through its employees, acted with reckless disregard as to the defamatory meaning of the three of the five quotations.[10]

In considering the relevant quotations of "I don't know why I put it in," "greatest analyst who ever lived," and "intellectual gigolo," the Court will review the evidence presented against the New Yorker. The following New Yorker employees testified: Botsford, the editor of the piece, Shawn, the editor-in-chief, Franklin, the fact-checker, and Joseph Cooper, legal counsel to the New Yorker.

Botsford was asked about his practice regarding defamatory material as an editor at the New Yorker. The following exchange occurred between Botsford and counsel for plaintiff:

> Mr. Morgan: Well, let me ask you: If you review an article and you see something that you think might be defamatory, you just ignore it then?
>
> Mr. Botsford: No, I mark it. But I'm not a lawyer, you know. If it's something that really jumps out and socks you in the eye, even I can see it's libelous, or I think it is, I mark it and sometimes write in the text, I write in libel with a query just so the libel lawyer can't possibly miss it, and expect to hear from him.

Botsford further testified that Mr. Greenstein, the New Yorker's libel lawyer, marked the phrase "sex, women, fun" to indicate that

---

9. However, the Court believes that awareness of falsity may impose on defendant a heightened vigilance for defamatory meaning. This would appear to be particularly true for any defamatory meaning communicated by falsely quoted remarks. As the Supreme Court stated,

> A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation. First, the quotation might injure because it attributes an untrue factual assertion to the speaker.... Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold.

*Masson v. New Yorker*, —— U.S. at ——, 111 S.Ct. at 2430.

However, because the jury did not find that the New Yorker acted with knowledge of falsity, and the Court has already concluded in its independent review that the evidence does not support a finding that the New Yorker acted with knowledge of falsity or reckless disregard of truth or falsity, there is no need at this time to consider any heightened vigilance for defamatory meaning imposed by knowledge of falsity.

10. Two quotations need not be considered in this analysis. There is no need to review the "wrong man" quotation because Malcolm made the alteration before submitting the manuscript to her editor at the New Yorker, so that the New Yorker had no individual liability for that quotation. There is likewise no need to review the evidence on the "sex, women, fun" quotation. The jury found that the New Yorker was aware of the defamatory meaning, but that it did not act with knowledge of falsity or reckless disregard as to truth or falsity. Thus, any error in failing to give an instruction on the lesser standard of reckless disregard is irrelevant.

he recommended deleting it.[11] However, there was no evidence that any other phrase was marked as libelous or potentially libelous.

When asked about his perception of the phrase "intellectual gigolo," Botsford testified, "[i]t didn't strike me as a bit of libel." He further testified that he did not consider that statement "something maybe we better check."

As for the "greatest analyst" quotation and the "I don't know why I put it in" quotation, Botsford was not asked if he considered those quotations to be defamatory. Nor did Botsford indicate that he considered those quotations to communicate or to potentially communicate any defamatory meaning. Additionally, Botsford testified that he thought plaintiff would like the piece.

William Shawn gave no testimony regarding the "sex, women fun" quotation or the "intellectual gigolo" quotation. However, he was questioned at some length about the "I don't know why I put it in" quotation and the "greatest analyst" quotation. When asked about the "I don't know why I put it in" quotation, Shawn testified that if plaintiff did not say the words attributed to him, he would disapprove. However, he further testified, "Intention is very important here. I don't think it was done—it was done for some literary reason that I don't know, and I can't imagine that it would harm Mr. Masson in any way or that he would mind it, but I don't know." Shawn Depo. at 32:16–20. Shawn stated,

> I would say that those words should not have been put in. I would think it is a change of tone or something. No harm is intended by it, but I would not be for putting it in. I say that it should not have been put in.... I think it is changing the meaning because he didn't say it.

Shawn Depo. at 35:5–13. Shawn nowhere testified that he considered the change damaging to plaintiff or otherwise defamatory. Moreover, Shawn was asked to interpret plaintiff's words on tape, in which plaintiff said, "I really believe it" rather than "I don't know why I put it in." Shawn testified that

his understanding of those words was that plaintiff really believed that his statement that psychoanalysis is sterile would offend psychoanalysts, not that he really believed that psychoanalysis was sterile. *Id.* at 32:21–34:8.

With respect to the "greatest analyst who ever lived" quotation, Shawn was asked, "If you were to listen to the tapes and read the transcripts and see that Mr. Masson had consistently said just the opposite of what is in that quote that was not on the tape, is it your testimony that you would still believe Janet Malcolm?" Shawn Depo. 52:6–11. Shawn replied,

> It would make me very nervous, but if I saw—if I heard it on the tape or saw in the transcript that he said just the opposite, and if what you are telling me now is correct, I would certainly be made uneasy. That would be pretty—that would be—no matter how much I trust Janet Malcolm, I might be made very nervous and say, 'Lord, what has happened here? He said the opposite.' I would worry.... I would say that if it were done by a responsible journalist, it would be a lapse into irresponsibility. I couldn't justify it.

Shawn Depo. 52:11–53:7. However, this testimony refers to what Shawn would feel about falsity if he were aware that Malcolm's piece did not reflect what was on the tapes. Shawn never testified that prior to publication, his attention was drawn to that quotation, that he ever considered the quotation defamatory, or that he was ever aware of a defamatory meaning attached to or communicated by that quotation. Moreover, he did not testify that he considered the quotation defamatory at the time of his testimony.

Neither Nancy Franklin nor Joseph Cooper gave evidence indicating that they were aware of the defamatory meanings complained of, or entertained any perception of defamatory meaning in the relevant quotations. There was no evidence that Botsford or any other employee of the New Yorker saw any other quotation as libelous during the editorial process. And while plaintiff's

---

11. The jury found that the New Yorker was aware of the defamatory meaning of this quote, but that it did not act with knowledge of falsity or reckless disregard of truth or falsity.

then-attorney called the New Yorker before the second part of the series was distributed, there was no evidence that he drew the New Yorker's attention to any false or defamatory quotations.

■ The Court's review of the evidence indicates that, as to the three remaining quotations, plaintiff put on no evidence that would support a finding that the New Yorker acted with awareness of defamatory meaning or reckless disregard of defamatory meaning, regardless of whether the appropriate standard of proof is proof by a preponderance of the evidence or proof by clear and convincing evidence. In the absence of evidence of reckless disregard of defamatory meaning, any failure to instruct is harmless. Fed. R.Civ.P. 61, *Peterson v. Mountain States Telephone & Telegraph Co.*, 349 F.2d 934, 936–38 (9th Cir.1965); *Sanderson v. Chapman*, 487 F.2d 264, 266–67 (9th Cir.1973).

The Court thus finds that plaintiff waived his argument on reckless disregard. But even if he did not waive the argument, he presented no evidence that would support a jury finding in his favor. Therefore, plaintiff's motion for a new trial against the New Yorker on the grounds of an erroneous instruction regarding reckless disregard of awareness of defamatory meaning is denied.

### C. *Malcolm's Employment Status*

Plaintiff's next argument turns on Janet Malcolm's employment status. The jury was instructed that in determining whether Malcolm was an employee of the New Yorker or an independent contractor,

> [T]he principal question is whether the New Yorker had the right to control both the result to be accomplished and the manner and means by which the result is accomplished regardless of whether [it] exercised that right. Controlling the 'manner and means' by which the result is accomplished requires involvement in the details and the process of the work.

*Jury Instructions* at p. 32. The jury was further instructed that a number of secondary factors were to be considered in answering this question. Finally, the jury was instructed that only if it found that Malcolm

was an employee could it find the New Yorker vicariously liable for her actions. The jury determined that Janet Malcolm was not an employee of the New Yorker, but rather was an independent contractor. *Special Verdict Question 5.*

Plaintiff first argues that the Court erred in instructing the jury that plaintiff was required to prove Malcolm was an employee rather than an agent of the New Yorker. Plaintiff next argues that the evidence produced at trial is insufficient to show that Janet Malcolm was an independent contractor, contending that the evidence shows as a matter of law that Malcolm was an agent or employee of the New Yorker. Plaintiff finally suggests that counsel for the New Yorker conducted himself improperly in arguing that the copyright status of the article was a factor to consider in determining the relationship between the New Yorker and Malcolm.

#### 1. *Procedural History*

The determination of Malcolm's status was hotly contested and thoroughly and repeatedly briefed both before and during the trial. Plaintiff first brought up the issue in his April 20, 1993 *Trial Brief*, in which he stated, "[i]t is plaintiff's contention that Malcolm was an employee or agent of the *New Yorker* and thus knowledge of falsity on the part of the *New Yorker* may be established by virtue of its vicarious liability for Malcolm's acts." In its May 6, 1993 *Partial Tentative Ruling*, the Court stated that in determining whether defendant New Yorker acted with reckless disregard, the relevant state of mind "is that of an employee or agent." The Court further stated in that tentative ruling that it would give instructions on the law of agency and of independent contractors. On May 10, 1993, the New Yorker filed its *Memorandum re: Vicarious Liability* and requested clarification of that statement. The New Yorker argued that the state of mind of an independent contractor or a non-employee agent cannot be imputed to a publisher under the constitutional framework set forth in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710. On May 19, 1993, plaintiff filed his *Memorandum of Points and Authorities Re:*

*Defendant Malcolm's Status as Agent or Employee.* Plaintiff argued that Malcolm was an employee as a matter of law, or, in the alternative, that she was an agent whose acts could be imputed to the New Yorker. Plaintiff further asked the Court to give BAJI 13.20, an instruction that distinguished between an agent and an independent contractor instead of between an independent contractor and an employee, if Malcolm's employment status was put to the jury.

In its May 20, 1993 *Tentative Ruling*, the Court addressed this issue. The Court stated that while general principles of *respondeat superior* applied to employees of the New Yorker, general principles of agency did not. The state of mind of an agent (as opposed to an employee) would not serve as a basis for imputed liability. The Court stated "if Malcolm is found to be an independent contractor, then her state of mind should not be imputed to the New Yorker. However, if she is found to be an employee, the general rules regarding *respondeat superior* will apply."

On May 21, 1993, the New Yorker moved for judgment as a matter of law on Malcolm's status as an independent contractor, arguing that the evidence presented was undisputed and that, as a matter of law, Malcolm was an independent contractor. Plaintiff filed his opposition to this motion on May 24, 1993, arguing that Malcolm "must either be considered an employee/agent of the New Yorker as a matter of law, or the matter must be submitted to the jury." The Court denied the motions of both parties to determine Malcolm's employment status as a matter of law, and submitted the issue to the jury.

### 2. *Agency vs. Employment*

Despite the previous extensive briefing on these issues, plaintiff renews his argument on the issues of whether Malcolm is an employee or an independent contractor and whether an agency relationship may impose liability. The Court will once again consider whether the relationship between an agent and a principal is sufficient under the Constitution to impose liability in the arena of public figure defamation by the media.

■ The Court finds that general agency rules do not apply in the constitutional context. Indeed, the requirement that the defendant's state of mind be proven is the cornerstone of the constitutional requisite that a plaintiff prove by clear and convincing evidence that the defendant acted with knowledge of or reckless disregard of the truth. In *New York Times*, the Supreme Court held that individuals whose names were found on the advertisement which was the subject of the suit could not be held liable. The Court required more than mere agency was required by the Constitution when it held,

> Even assuming that they could constitutionally be found to have authorized the use of their names on the advertisement, there was no evidence whatever that they were aware of any erroneous statements or were in any way reckless in that regard. The judgment against them is without constitutional support.

*Id.*, 376 U.S. at 286, 84 S.Ct. at 729. The Supreme Court has clearly held that the defendant must act with the requisite mental state.

■ Subsequent lower courts have explicitly held that agency does not impose liability. As one court has stated, "the stringent standards required by the First Amendment make application of agency theory inappropriate" in this context. *Murray v. Bailey*, 613 F.Supp. 1276, 1281 (N.D.Cal.1985). *See also Price v. Viking Penguin, Inc.*, 881 F.2d 1426 (8th Cir.1989); *Hunt v. Liberty Lobby*, 720 F.2d 631 (11th Cir.1983); *Secord v. Cockburn*, 747 F.Supp. 779, 787 (D.D.C. 1990); *Nelson v. Globe International, Inc.*, 626 F.Supp. 969, 977–78 (S.D.N.Y.1986); *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 961–62 (D.D.C.1976); *Belli v. Curtis Publishing Co.*, 25 Cal.App.3d 384, 102 Cal.Rptr. 122 (1972).

Plaintiff cites a number of cases in his argument. However, none of these support the proposition that an agency relationship is sufficient to impose liability on the New Yorker. In his post-trial brief, plaintiff cites to a 1928 case in which a bank was held liable for the defamatory statements made by a detective agency hired by the bank. *Draper*

v. *Hellman Commercial Trust and Sav. Bank,* 203 Cal. 26, 263 P. 240 (1928). However, that case was decided long before the Supreme Court's decision in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, and was based on the inapplicable common law of defamation. *Draper* did not address the constitutional element involved when a media defendant is alleged to have defamed a public figure plaintiff, both because the constitutional standard would not be announced for thirty-five years, and because the case did not involve a media defendant or a public figure plaintiff. Thus, this case is clearly inapposite. And while *Draper* was cited more recently in *Montandon v. Cox Broadcasting Corp.,* 45 Cal.App.3d 932, 120 Cal. Rptr. 196 (1975), the court there did not consider *Draper* because no agency relationship was presented. Thus, the court there did not address whether *Draper* had any continuing application.

In his post-trial brief, plaintiff also cites a number of cases which hold that an independent contractor may also be an agent. *Doctors' Co. v. Superior Court,* 49 Cal.3d 39, 260 Cal.Rptr. 183, 775 P.2d 508 (1989); *Los Angeles v. Meyers Bros. Parking System, Inc.,* 54 Cal.App.3d 135, 138, 126 Cal.Rptr. 545 (1975). While the Court does not dispute that as a matter of general principle, an independent contractor may be an agent, the cases cited by plaintiff do not involve the constitutional dimension presented here and are thus not applicable.

Plaintiff additionally contends that the Supreme Court approved a jury instruction referring to both employees and agents in *Cantrell v. Forest City Pub. Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974). In *Cantrell,* the Court upheld a jury finding that a newspaper publisher could be vicariously liable for the knowing falsehoods contained in a story written by an employee of the paper. *Id.* at 254, 95 S.Ct. at 471. While the trial court in that case instructed the jury that the publisher could be liable for the acts of an employee or an agent, neither side objected to the instruction. *Id.* at 253–54, n. 6, 95 S.Ct. at 470–71, n. 6. Further, there was no question that the writer was an employee

rather than an independent contractor. *Id.* at 254, 95 S.Ct. at 471. The Supreme Court did not address the question of liability for an independent contractor, as that was not an issue in *Cantrell.* Thus, *Cantrell* does not stand for the proposition that an independent contractor can serve to impute liability on a publisher.

Plaintiff cited two additional cases after the post-trial briefs were filed, and both require some detailed discussion. Plaintiff cited *Douglass v. Hustler Magazine, Inc.,* 769 F.2d 1128 (7th Cir.1985) for the first time at oral argument on the post-trial motions. He cited *Gertz v. Robert Welch, Inc.,* 680 F.2d 527 (7th Cir.1982) in a footnote to the final page of his post-hearing *Supplemental Memorandum In Response To New Yorker Magazine Inc.'s Supplemental Memorandum.* Neither case compels the result plaintiff seeks, and neither supports the proposition that in the constitutional context, an independent contractor relationship suffices to impose liability on a publisher.

Plaintiff argued that in *Douglass v. Hustler Magazine,* the Seventh Circuit held that a publisher may be responsible for the acts of an agent. But this Court does not so read *Douglass.* The Court will discuss this case in some detail because plaintiff cited it as a circuit court case which applied agency principles in a public figure defamation case, as contrasted to the district court cases cited by the New Yorker for the proposition that agency principles do not apply in a case such as the one before the Court.

In *Douglass,* an actress/model who was found to be a public figure posed for freelance nude photographer Augustin Gregory. Gregory was later hired as a photography editor at Hustler magazine. The magazine published the photos under captions which plaintiff alleged were defamatory. Before the photos were published, and after Gregory was hired, Hustler management asked Gregory for releases from plaintiff. Initially, Gregory told management that he could not find the releases, but he later produced two releases purportedly[12] signed by the plaintiff. *Id.* at 1132.

---

12. The parties stipulated that plaintiff's signature

had been forged on one of the releases, and that

In arguing that it did not have the requisite mental state to establish constitutional malice, Hustler contended that it relied on Gregory to supply the releases. Rejecting that argument, the court pointed out that "Gregory was *Hustler's* photography editor, acting within the scope of his employment, so that his knowledge of the falsity of the release was the corporation's knowledge." *Id.* at 1139–40. The court distinguished between Gregory's role as an independent contractor and seller of the photographs, and his role as photography editor and Hustler employee.

> It makes no difference whether in submitting the photographs he was acting as an independent contractor, as *Hustler* argues, or as an employee. As photography editor, which is to say in his capacity as an employee, he had some—it does not matter precisely how much—responsibility for the provenance of the photographs that were published. If someone had submitted nude photographs of [plaintiff] to him without a release and he had told his supervisors there was a release, he would have been acting within the scope of his employment. It makes no difference that in fact he was the seller as well as the buying agent.

*Id.* at 1140. The court went on to make the broad statement that "[t]he doctrine of *respondeat superior* is fully applicable to suits for defamation and invasion of privacy, not withstanding the limitations that the First Amendment has been held to place on these torts." *Id.*

This Court does not disagree that the doctrine of *respondeat superior* applies to employees. Indeed, this Court held precisely that in its *Tentative Ruling* of May 20, 1993. The Court there held that the state of mind of any employee of the New Yorker could be imputed to the magazine. Further, as this Court reads *Douglass v. Hustler,* the Seventh Circuit did not hold that a publisher should be held liable for the acts of an independent contractor, despite the expansive

wording its general conclusion. But regardless of the Seventh Circuit's holding, this Court cannot apply the sweeping statement that the doctrine of *respondeat superior* is "fully applicable" in this case. To do so would be contrary to the constitutional requirements set forth in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710.

The Court next addresses *Gertz v. Robert Welch, Inc.,* 680 F.2d 527 (7th Cir.1982) cited by plaintiff for the proposition that a non-employee writer's conduct in investigating and researching an article can be attributed to the publisher in evaluating whether the publisher acted with "actual malice." The Court concludes that the reasoning of the Seventh Circuit in *Gertz v. Welch* does not apply in this case because *Gertz* was not decided in the constitutional context.[13]

Gertz, a Chicago attorney who was not a public figure, sued the publisher of an article which, among other things, labelled him a Communist. A jury returned a verdict in favor of Gertz. However, the trial court granted judgment notwithstanding the verdict, holding that the subject matter of the article was of "public interest." The trial court held that this imposed on plaintiff the burden of showing actual malice pursuant to *New York Times v. Sullivan.* The trial court held that because actual malice had not been established, the jury verdict could not stand. *Gertz v. Welch,* 322 F.Supp. 997. The Court of Appeals affirmed, *Gertz v. Welch,* 471 F.2d 801, but was reversed by the Supreme Court. *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997. The Supreme Court held that the publisher of defamatory falsehoods about a person who was neither a public official nor a public figure was not entitled to constitutional protection from liability for those injuries caused by those false and defamatory statements. *Gertz v. Welch,* 418 U.S. at 332, 94 S.Ct. at 3003. In remanding to the trial court, the Supreme Court held that "so long as they do not impose liability without fault, the States

---

the authenticity of the other could not be evaluated.

**13.** The action in that case, like the action before this Court, had a long journey through the federal court system. *Gertz v. Robert Welch, Inc.,* 322

F.Supp. 997 (N.D.Ill.1970), *Gertz v. Robert Welch, Inc.,* 471 F.2d 801 (7th Cir.1972), *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), *Gertz v. Robert Welch, Inc.,* 680 F.2d 527 (7th Cir.1980).

may define for themselves the appropriate standard of liability." *Id.* at 347, 94 S.Ct. at 3010.

On remand, the defendant raised the affirmative defense of conditional or qualified privilege. This privilege is based on Illinois law and "permits the reporting of public proceedings in which defamatory statements have been made about private individuals." *Gertz v. Welch*, 680 F.2d at 535. Under Illinois law, "a conditional privilege can only be overcome by proof of actual malice." *Id.* at 534. The Illinois courts have adopted the *New York Times* definition of actual malice for the purpose of overcoming the state conditional privilege. *Id.* at 535, n. 13. Thus, under state law, a plaintiff must show a defendant acted with knowing falsity or reckless disregard of the truth or falsity of the defamatory statement to overcome a conditional privilege. *Id.* at 534, 547. However, this is a matter of state law and is not constitutionally required. Therefore, the court was applying state law and not constitutional law in analyzing the conduct of the defendant publisher and the author in that case. The court looked to the "significant control" exercised by the publisher over the article and determined that the facts were "sufficient to establish an agency relationship. [citing Illinois law]." *Id.* at 539, n. 19. The court went on to hold that, based on state law, "the implications of that relationship are that the acts of the agent are attributable to the principal [citing Illinois law]."

This holding, based solely on Illinois law, and not to this Court's knowledge cited by any court in California or in the Ninth Circuit, is neither constitutionally based nor authority for the proposition that an agency relationship is sufficient to establish liability in the context of a public figure plaintiff alleging defamation by a media defendant. This case, like the others cited by plaintiff, does not support a finding that an agency relationship should impose liability in the constitutional context.

■ The court has carefully reviewed this question, both before the jury was instructed and at the post-trial stage. Plaintiff has cited no authority which would support a finding that an agency relationship could

serve to impute liability to a publisher in the absence of an employment relationship. Most importantly, however, the constitutional mandate of *New York Times v. Sullivan* prohibits liability based solely upon an agency relationship. Accordingly, plaintiff's motion for a new trial on this ground must be denied.

### 3. *Clear Weight of the Evidence*

■ Plaintiff next argues that the jury determination that Malcolm was an independent contractor was against the clear weight of the evidence. The Court is empowered to set aside a verdict supported by substantial evidence when it is contrary to the clear weight of the evidence. *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir.1957). Plaintiff argues that the Court should exercise that power here. However, this argument is without merit. Evidence was presented by both the New Yorker and plaintiff regarding Malcolm's employment status, but the clear weight of the evidence is not such that it compels the setting aside of the verdict. While plaintiff points to evidence in support of a finding that Malcolm was an employee, a great deal of evidence was presented which supports the jury's finding that Malcolm was an independent contractor.

■ Before reviewing the evidence, the Court will review the applicable law. The standard for distinguishing between an employment relationship and an independent contractor relationship has been set forth by the California Supreme Court as follows:

> The principal test of an employment relationship is whether the person to whom the service is rendered has the right to control the manner and means of accomplishing the result desired (citation omitted). If control may be exercised only as to the result of the work and not the means by which it is accomplished, an independent contractor relationship is established (citation omitted).

*Tieberg v. Unemployment Ins. Appeals Board*, 2 Cal.3d 943, 946–47, 88 Cal.Rptr. 175, 471 P.2d 975 (1970). Other factors to be considered include whether the putative em-

ployee is engaged in the same business as the putative employer; whether the kind of work is usually done by a specialist without supervision; whether the employer or the worker supplies the tools, instrumentalities, and place of work; the length of time for which the worker has worked for the employer; the method of payment; whether or not the work is a part of the regular business of the employer; whether or not the parties believe they are creating an employment relationship; and whether or not the employer is in business. *Tieberg,* 2 Cal.3d at 951, 88 Cal.Rptr. 175, 471 P.2d 975; *Jury Instructions* at p. 33.

█ Both parties presented evidence on the key issue of the New Yorker's control over the manner and means of accomplishing the result desired. The evidence shows that Malcolm was not given assignments by the New Yorker. Rather, she would conceive an idea for an article and would present that idea to the editor-in-chief, who would tell her if the New Yorker was interested or not. If the New Yorker was interested, it would pay her expenses. If it was not, she was still free to work on the idea and to attempt to sell it elsewhere. She was not required to abandon the idea or to work on a concept proposed by the New Yorker. Once the New Yorker expressed interest and Malcolm began work on a piece, she was not given a deadline. She was not told what to write, when to write, or how to write. Nor was she told *who to interview, when to interview, or what questions to ask or leads to follow.* Once the piece was submitted and accepted, a number of New Yorker employees, including editors, proofreaders, and fact-checkers, reviewed it and made a variety of changes. The New Yorker significantly edited her pieces before they were published.

Plaintiff places great weight on the fact that the New Yorker edited Malcolm's piece once she submitted it. He argues that this editing shows the sort of control that creates an employment relationship. However, *Tieberg* does not stand for the proposition that the mere fact of editing creates an employment relationship. In *Tieberg,* the issue was whether screenwriters for the television show *Lassie* were employees for purposes of col-

lecting unemployment insurance. In that case, the parties entered into contracts whereby Lassie could and did exercise considerable control over the writers' work as they created screenplays. The court noted that "[t]he desires, suggestions, requests and directions of Lassie's staff were in effect commands which had to be and were complied with by the writers if they could not convince Lassie that its suggested changes were inappropriate. Failure to comply would result in forfeiting future employment." *Id.* at 949, 88 Cal.Rptr. 175, 471 P.2d 975. The court found that the evidence was "clearly sufficient to show that Lassie exercised considerable control over the manner and means by which a writer fabricated a teleplay from a story." *Id.* at 953, 88 Cal. Rptr. 175, 471 P.2d 975. However, *Tieberg* did not hold that as a matter of law, the editorial process itself creates an employment relationship.

The Court cannot hold that, without more, an editor who suggests changes in a submitted manuscript is exercising control over the manner and means of accomplishing the desired result. Indeed, to so hold would mean that every time a writer's work is edited, the writer becomes an employee of the publisher. This Court cannot reach that conclusion, nor does it find that the California Supreme Court has reached that conclusion in *Tieberg.* Editorial control, standing alone, is not control over "the manner and means of accomplishing the result desired" which gives rise to an employment relationship. A jury could well find, and in this case must have found, that editing a manuscript in order to put it in a form for publications is "control ... exercised only as to the result of the work and not the means by which it is accomplished." *Id.* at 946–47, 88 Cal.Rptr. 175, 471 P.2d 975.

Thus, the great weight of the evidence does not support a finding that the relationship between Malcolm and the New Yorker met the principle test of employment, that is, control over the manner and means of the result desired.

█ The Court will now turn to the evidence on the secondary factors to be considered. These included the following. Malcolm signed a yearly contract to use her

"best efforts" for the New Yorker, in return for $2,000 in consideration. The contract provided no guarantee for renewal and did not speak in terms of employment. However, the contract had been repeatedly renewed over a period of approximately twenty years. Malcolm was not obligated to submit works, and the New Yorker was not obligated to accept them. However, she believed that the New Yorker would accept the piece on Masson unless it was "insane." Malcolm was given an office and typewriter which she used at times. However, she did much of her writing at home, and she was not required to use the New Yorker's office or to be at the office on any given day or at any given time. She used New Yorker stationery and referred to herself as a staff writer for the New Yorker. She did not receive regular payments in the form of salary, but was paid if and only if the New Yorker accepted a piece of writing. At that time, she would be paid a lump sum. She was paid certain health and retirement benefits. Malcolm reported her earnings to the Internal Revenue Service on a 1099 form, not on a W–2. Malcolm retained the copyright in her works.[14] Botsford, Malcolm, and Shawn testified that she was considered an independent contractor.

Thus, there is evidence that would support a finding that she was an employee. There is likewise considerable evidence that would support a finding that Malcolm was an independent contractor. However, the clear weight of the evidence does not compel a finding that she was an employee. Indeed, the Court was inclined to find Malcolm an independent contractor as a matter of law until plaintiff presented *Tieberg*. Based on the holding in that case, the Court determined that the question should go to the jury. The jury considered the factors set forth in *Tieberg* and determined that Malcolm was an independent contractor. This determination was supported by the evidence, and is not contrary to the clear weight of the evidence. The Court does not find

that it is required to set aside the jury's determination. Accordingly, the Court will deny plaintiff's motion for a new trial on these grounds.

### 4. *Argument of New Yorker's Counsel*

Plaintiff contends that counsel for the New Yorker "conducted himself improperly" in arguing to the jury that the copyright status of the article was a factor to consider in determining the relationship between the New Yorker and Malcolm. In order to show misconduct, plaintiff must show that "counsel's misconduct so permeated the trial as to lead to the conclusion the jury was necessarily influenced by passion and prejudice in reaching its verdict." *Cooper v. Firestone Tire and Rubber Co.*, 945 F.2d 1103, 1107 (9th Cir.1991).

In considering whether there was any misconduct on the part of the New Yorker's counsel, the Court first notes that the argument regarding copyright status was a proper argument. Generally, the copyright of a work created by an employee rests with the employer unless the parties have expressly agreed otherwise. 17 U.S.C. §§ 101, 201(b), *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166. However, copyright status is not determinative of employment status because parties may make contractual arrangements regarding copyright. *Id.* Nonetheless, the New Yorker was free to argue that the fact that Malcolm retained the copyright in her works was evidence of the understanding the parties had of their relationship. This argument properly addresses one of the factors to be considered in evaluating Malcolm's employment status.

Second, the Court notes that plaintiff did not object to this argument at the time it was made, and so has waived any objection. Finally, there is absolutely no basis for a finding that the argument regarding the copyright status of the article "so permeated the trial as to lead to the conclu-

---

**14.** While copyright status is not determinative of employment status, and parties are free to negotiate the copyright status of any work, 17 U.S.C. §§ 101, 201(b), *Community for Creative Non–Violence v. Reid*, 490 U.S. 730, 109 S.Ct. 2166, 104

L.Ed.2d 811 (1989), the fact that Malcolm retained the copyright in her writings is evidence that the parties considered themselves to be in a non-employee relationship. This argument will be considered in greater detail below.

sion the jury was necessarily influenced by passion and prejudice in reaching its verdict." *Cooper v. Firestone,* 945 F.2d at 1107. Accordingly, plaintiff's argument that a new trial should be granted on these grounds is without merit.

### D. *New Yorker's Motion for Entry of Judgment*

 The Court has concluded that plaintiff is not entitled to a new trial against the New Yorker on any of the grounds urged. The jury answered special verdict questions pursuant to Rule 49(a). The Court must then apply the law to the facts as found by the jury. *See e.g., Floyd v. Laws,* 929 F.2d 1390 (9th Cir.1991). The fact that the jury did not reach a verdict on the issue of damages is of no moment, given that a finding of no liability for the New Yorker means that there is no need for a finding of damages. *Id.* at 1397. Likewise, the fact that the jury did not answer every interrogatory does not prevent the Court from accepting the answers of the jury on the severable questions. *See Bridges v. Chemrex Specialty Coatings, Inc.,* 704 F.2d 175, 180 (5th Cir. 1983).

 The Court's review indicates that actions of the jury in their answers to *Special Verdict Questions 5, 6* and *7* must be enforced, giving rise to a final judgment for the New Yorker and against Jeffrey Masson. The question the Court must address next is whether that judgment should be entered or rather, should be stayed.

Rule 54(b) of the Federal Rules of Civil Procedure provides that the court may direct entry of final judgment as to one party "upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Pursuant to this rule, the New Yorker seeks an entry of judgment against it based upon the jury's special verdict answers. Plaintiff objects that entering judgment would result in a "piecemeal appeal."

The Supreme Court, in considering when a motion for judgment under Rule 54(b) should be granted, held that judgment should not be granted as a matter of course. *Curtiss-*

*Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). Rather, judgment should be entered only if the court determines "after balancing the competing factors, finality of judgment should be ordered to advance the interests of sound judicial administration and justice to the litigants." *Id.* at 5, 100 S.Ct. at 1463. The trial court is to act as a "dispatcher" to the appellate court, preserving where possible the historic federal policy of discouraging piecemeal appeals. *Id.* at 8, 100 S.Ct. at 1465. One important factor to consider is whether the appellate court would have to address the same issues more than once. *Id.* In this case, the Court must balance this against the New Yorker's important First Amendment right to a speedy resolution of the complaint in order to avoid the "chilling effect" of any protracted litigation. *Reader's Digest Asso. v. Superior Court,* 37 Cal.3d 244, 256–57, 208 Cal.Rptr. 137, 690 P.2d 610 (1984); *Sipple v. Chronicle Publishing Co.,* 154 Cal.App.3d 1040, 1046, 201 Cal.Rptr. 665 (1984).

In considering the relevant factors, the Court believes that entering judgment and permitting an appeal to go forward as to the New Yorker would not further sound judicial administration. It is highly likely that the appellate court would be faced with the same issues in an appeal of the judgment in favor of the New Yorker and any appeal of the result of the retrial between Malcolm and Masson. Balancing this against the New Yorker's right to a speedy resolution, the Court finds that the interests of justice would be best served by delaying entry of judgment. Thus, because there is "just cause for delay," the Court will deny the New Yorker's motion for entry of judgment. Pursuant to Federal Rule of Civil Procedure 62(h), the Court will stay enforcement of the judgment until the case is settled or otherwise resolved. The case will in the meantime be dismissed against the New Yorker.

### E. *Scope of New Trial*

 Due to the jury's failure to reach a unanimous decision on the issue of damages, the Court must order a new trial. Because the Court has dismissed the action against the New Yorker, the new trial will be be-

tween Jeffrey Masson and Janet Malcolm. Given this, the next issue to consider is the scope of the new trial. Plaintiff moves for a new trial limited solely to the issues on which it did not prevail, or, in the alternative, for a new trial on all issues. Malcolm argues for a new trial on all issues as to her. Neither party argues for a retrial on all issues solely as to the two quotations for which the jury found liability.

Rule 59(a) of the Federal Rules of Civil Procedure provides that a new trial "may be granted ... on all or part of the issues." However, the Supreme Court has held that a partial new trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 500, 51 S.Ct. 513, 515, 75 L.Ed. 1188 (1931). Here, the scope of the new trial depends on whether "the question of damages is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty." *Id.*

It is clear that the issues of damages and liability are so interwoven that a new trial on all issues is warranted. A jury cannot determine damages alone in this case without first considering liability, including the nature of plaintiff's reputation before the article was published, how the quotations defamed him by damaging that reputation, the falsity of the quotations, and, of course, the issue of constitutional malice.

While plaintiff argues in favor of retaining the jury's answers to special verdict questions regarding falsity and defamatory content of all five quotations, the Court sees no intellectually honest way of parsing the case in this manner. Furthermore, plaintiff himself argues that "[i]f forced to go forward against defendant Malcolm alone, solely on the issue of the two quotes remaining in the case, plaintiff will not get a fair trial."

Although an argument could be made that the new trial should encompass all issues only as to the two quotations, neither party makes that argument. In fact, both parties appear to wish a retrial of all issues as to all five quotations. The Court will therefore order retrial on all issues on all five quotations. The Court makes this ruling given the intertwined nature of liability and damages, in light of the express wishes of the parties, in consideration of the fact that the trial of all five quotes will not require considerably more time than would a trial of just two quotations, in view of the Court's reconsideration of the issue of reckless disregard, and in the interests of fairness and equity.

### F. Independent Review of Case Against Janet Malcolm

As discussed above, the Court must generally review a jury's determinations in a case such as this. *Harte–Hanks v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678 (1989); *Bose v. Consumers Union*, 466 U.S. at 510–11, 104 S.Ct. at 1964–65; *New York Times v. Sullivan*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. However, in light of the Court's determination that a new trial on all issues is required, there is no need for the Court to conduct an independent review of the evidence against Janet Malcolm.

### G. Motion to Strike Juror Declarations

In support of her motion for a new trial, Malcolm submits the affidavits of two of the jurors. Malcolm argues that these declarations show the uncertainty of the liability determination. Plaintiff has moved to strike these declarations pursuant to Federal Rule of Evidence 606(b). That rule states:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify in the question of whether extraneous prejudicial information was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by a juror concerning the matter about which the juror would

be precluded from testifying be received for these purposes.

This prohibition is intended to keep jury deliberations private so as to preserve freedom of discussion, ensure peace and privacy for jurors, and finalize verdicts. *See McDonald v. Pless,* 238 U.S. 264, 267–68, 35 S.Ct. 783, 784–85, 59 L.Ed. 1300 (1915). Malcolm argues that Federal Rule of Evidence 606(b) does not apply in this case because the jury did not reach a verdict. She further argues that the Court should consider these declarations as part of its independent review the jury's decision.

█ The Court finds first that it need not conduct an independent review the jury's decision regarding Janet Malcolm. Additionally, the Court finds that any such review would not justify the extraordinary measure of looking to jury declarations to inquire into their deliberations. The policy reasons for the prohibition carry no less weight in the event of a mistrial. In a mistrial as in a trial, free discussion in jury deliberations are to be encouraged, and jurors who have performed their civic obligations in a case ending in a mistrial should be accorded their peace. And while there may be no verdict to keep final, to allow the parties to enquire into the internal deliberations of the jury in the case of a mistrial would be to open the door to the very evils described in *McDonald v. Pless.* Accordingly, the Court will grant plaintiff's motion to strike juror declarations.

### H. *Remaining Motions*

In light of the foregoing, there is no need for the Court to address the following of defendant Malcolm's motions: *Motion For New Trial On The Grounds That The Verdict Is Against the Weight of the Evidence; Motion For New Trial On The Grounds Of Erroneously Excluded Evidence; Motion For New Trial On The Grounds Of Inconsistent Verdicts; Motion For New Trial On The Grounds Of Erroneous Jury Instructions;* and *Motion In The Alternative Regarding The "Wrong Man" Quote.*

### III. *Conclusion*

For the foregoing reasons, it is hereby ORDERED:

(1) The Court will enforce the jury's actions with respect to Special Verdict Questions 5, 6 and 7.

(2) Judgment is GRANTED in favor of the New Yorker and against Jeffrey Masson but STAYED pending final resolution of the case between Jeffrey Masson and Janet Malcolm.

(3) Defendant New Yorker's Motion for Entry of Judgment is DENIED.

(4) Defendant New Yorker is DISMISSED from this action.

(5) The Court will not enforce the jury's actions with respect to all Special Verdict Questions pertaining to Janet Malcolm.

(6) Because the trial ended without a unanimous verdict as to Janet Malcolm, the Court declares a mistrial between Janet Malcolm and Jeffrey Masson.

(7) Plaintiff's motion for a new trial as to the New Yorker is DENIED.

(8) Plaintiff's motion for a partial new trial as to Janet Malcolm proceeding on a finding of falsity and defamatory meaning as to all five quotations is DENIED.

(9) Defendant Malcolm's motion for a new trial on all issues as to her is GRANTED.

(10) Plaintiff's motion to strike juror declarations is GRANTED.

IT IS SO ORDERED.